Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Joanna Rosenblatt, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company and*
*GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,                                                    Docket No.: _____(      )

                                        Plaintiffs,

        -against-


TREE OF LIFE RX INC., SIMHO ARONOV, EBA
DRUG CORP. D/B/A FINE CARE PHARMACY, OLGA
ALKADA A/K/A OLGA BALLAS, NICOLA HOUSLIN
NP, AND JOHN DOE NOS. "1" THROUGH "10",

                                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants Tree of Life Rx Inc. ("Tree of Life

Rx"), Simho Aronov ("Aronov"), EBA Drug Corp. D/B/A Fine Care Pharmacy ("Fine Care

Pharmacy"), Olga Alkada a/k/a Olga Ballas ("Ballas"), Nicola Houslin NP ("NP Houslin") and

John Doe Nos. "1" through "10" (the "John Doe Defendants") (collectively, the "Defendants"),

hereby allege as follows:

1.      GEICO brings this action to terminate a large, complex fraudulent scheme perpetrated by the Defendants who exploited the New York "No-Fault" insurance system by submitting more than $2.5 million in fraudulent pharmaceutical billing to GEICO over just twenty-two months in "quick-hit" fashion. The Defendants' scheme targeted expensive topical prescription drug products, which they systematically dispensed to individuals involved in motor vehicle accidents without regard for genuine patient care.  As part of the fraudulent scheme, the Defendants engaged in collusive relationships to steer large volumes of medically unnecessary prescriptions for the drug products to Defendants Tree of Life Rx and Fine Care Pharmacy (collectively, the "Pharmacy Provider Defendants") so the Defendants could submit them in support of their fraudulent claims.

2.      The Pharmacy Provider Defendants purported to be legitimate, community retail pharmacies located in Brooklyn, New York. However, Aronov, Ballas, and the John Doe Defendants used the Pharmacy Provider Defendants as part of an integrated scheme to exploit patients for financial gain by overwhelmingly targeting two products – topical Lidocaine 5% Ointment ("Fraudulent Topical Lidocaine") and topical Diclofenac Gel 3% ("Fraudulent Diclofenac Gel") (together with the Fraudulent Topical Lidocaine, the "Fraudulent Topical Pain Products") -- typically resulting in charges to GEICO of $1,524.00 to $1,888.00 per single prescription.  The Fraudulent Topical Pain Products were allegedly dispensed to individuals involved in motor vehicle accidents and eligible for coverage under policies of insurance issued by GEICO (the "Insureds") pursuant to fraudulent, predetermined prescribing and dispensing protocols.

3.      The Defendants' fraudulent scheme began in early 2023 when they joined and/or

capitalized upon their involvement in a network of individuals regularly involved in No-Fault insurance fraud who could facilitate both illegal, collusive arrangements that generated large volumes of fraudulent pharmaceutical claims billed to GEICO and other New York automobile companies and the collection on those fraudulent claims through the large-scale use of piecemeal collection proceedings, where the pattern of fraud is not readily apparent to New York automobile insurers.

4.      As part of the scheme, the Defendants engaged in illegal, collusive agreements with NP Houslin and other prescribing healthcare providers (the "Prescribers"), and persons (the "Clinic Controllers") who work at or are associated with various multidisciplinary medical clinics that almost exclusively treat No-Fault patients (the "No-Fault Clinics"), and steered them to direct large volumes of prescriptions for the targeted Fraudulent Topical Pain Products, along with limited amounts of other medications (collectively, the "Fraudulent Pharmaceuticals"), to the Pharmacy Provider Defendants. The Defendants furthered their scheme by using the Pharmacy Provider Defendants in successive fashion, using each Pharmacy Provider Defendant to bill for only a brief time before abruptly ceasing active operations of that pharmacy and moving on to the next pharmacy name, without any legitimate explanation beyond avoiding detection of the integrated scheme.

5.      By this action, GEICO seeks to recover the monies Defendants stole from it, in the approximate amount of $177,000.00, along with a declaration that GEICO is not legally obligated to pay reimbursement to the Pharmacy Provider Defendants of approximately $2.1 million in pending fraudulent New York No-Fault claims that the Defendants submitted or caused to be submitted through the Pharmacy Provider Defendants because:

(i)      The Defendants billed for pharmaceutical products that were not medically necessary, but rather prescribed and dispensed pursuant to predetermined

fraudulent protocols designed to exploit patients for financial gain, without regard for genuine patient care;

(ii)    The Defendants inflated the charges to GEICO by intentionally targeting the Fraudulent Topical Pain Products, which they acquired at low cost and dispensed through the Pharmacy Provider Defendants in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals in order to exploit the reimbursement rates set forth by 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee schedule");

(iii)    The Defendants participated in illegal, collusive arrangements in which they steered NP Houslin, the other Prescribers, and the Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacy Provider Defendants in exchange for unlawful kickbacks and other financial incentives; and

(iv)    The Defendants submitted or caused to be submitted charges for the Fraudulent Pharmaceuticals under the names of the Pharmacy Provider Defendants pursuant to illegal, invalid, and duplicitous prescriptions.

6.    The Defendants fall into the following categories:

(i)    Tree of Life Rx and Fine Care Pharmacy are New York corporations that engaged in a fraudulent scheme in which they dispensed the Fraudulent Pharmaceuticals in order to submit to GEICO and other New York automobile insurers claims for reimbursement of No-Fault Benefits to which they were not entitled;

(ii)    Aronov and Ballas are the record owners of Tree of Life Rx and Fine Care Pharmacy, respectively;

(iii)    NP Houslin is a Prescribing Provider who, pursuant to illegal, collusive financial arrangements and predetermined protocols, issued prescriptions accounting for approximately 66% of the billing for the Fraudulent Pharmaceuticals submitted to GEICO through Tree of Life, and approximately 97% of the billing for the Fraudulent Pharmaceuticals submitted to GEICO through Fine Care Pharmacy as part of the fraudulent scheme; and

(iv)    John Doe Nos. "1" through "10" (i.e., the John Doe Defendants) are persons and entities, presently not identifiable, who, along with the Defendants, participated in the operation and control of Tree of Life and Fine Care, including facilitating the illegal, collusive agreements with NP Houslin, the other Prescribers, and Clinic Controllers.

7.    The Defendants' scheme began in 2023 and continues uninterrupted to the present day as the Defendants continue to pursue collection on their unpaid fraudulent claims against

4

GEICO and other New York automobile insurers.

8.       As discussed more fully below, Defendants at all times have known that: (i) the billed-for pharmaceutical products were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants inflated the charges to GEICO by intentionally targeting specific pharmaceutical products they acquired at low cost and dispensed to Insureds through the Pharmacy Provider Defendants in large volumes at exorbitant charges, in place of other effective, less costly pharmaceuticals; (iii) the Defendants participated in illegal, collusive relationships in which they steered NP Houslin, the other Prescribers, and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacy Provider Defendants in exchange for unlawful kickbacks and other financial incentives; and (iv) the Defendants submitted fraudulent claims to GEICO for the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and duplicitous prescriptions and continue to seek collection on unpaid fraudulent claims.

9.       Based on the foregoing, the Pharmacy Provider Defendants do not have any right to be compensated for the Fraudulent Pharmaceuticals allegedly dispensed to GEICO Insureds. The charts attached hereto as Exhibits "1" and "2" set forth the fraudulent claims identified to-date which the Defendants submitted, or caused to be submitted, to GEICO through the United States mail or interstate wires seeking reimbursement under New York's No-Fault law.  As a result of the Defendants' scheme, GEICO incurred damages of approximately $177,000.00.

## **THE PARTIES**

## I.       **Plaintiffs**

10.       Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska

corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

## II.    <u>Defendants</u>

11.    Defendant Tree of Life Rx is a New York corporation, formed on or about June 15, 2020, with its principal place of business at 2472 Coney Island Avenue, Brooklyn, New York.

12.    Defendant Tree of Life Rx was first registered with the New York State Department of Education, Office of Professions on September 11, 2020.

13.    Defendant Aronov is domiciled in, resides in, and is a citizen of New York and is the record owner of Tree of Life Rx.

14.    Beginning in 2023, Aronov, together with the John Doe Defendants, began using Tree of Life to submit fraudulent pharmaceutical billing to GEICO.

15.    The billing from Tree of Life Rx was mailed and/or wired to GEICO from Brooklyn, New York.

16.    Defendant Fine Care Pharmacy is a New York corporation, formed on or about November 29, 2016, with its principal place of business at 1490 Flatbush Avenue, Brooklyn, New York.

17.    Defendant Fine Care Pharmacy was first registered with the New York State Department of Education, Office of Professions on March 30, 2017.

18.    Defendant Ballas is domiciled in, resides in, and is a citizen of New York and is the record owner of Fine Care Pharmacy.

19.    Beginning in 2024, Ballas, together with the John Doe Defendants, began using Fine Care Pharmacy to submit fraudulent pharmaceutical billing to GEICO.

20.    The billing from Fine Care Pharmacy was mailed and/or wired to GEICO from

Brooklyn, New York.

21.     The Defendants submitted fraudulent claims to GEICO under different pharmacy names to conceal the scheme, but each billed GEICO successively over short periods for substantially the same pharmaceuticals, based on prescriptions from common Prescribers, using similar billing forms, and similar delivery forms.

22.     NP Houslin resides in and is a citizen of New York. NP Houslin is a Prescribing Provider who, while working for Atlantic Medical & Diagnostic PC ("Atlantic Medical") knowingly issued prescriptions, or purported prescriptions for the Fraudulent Pharmaceuticals without regard for genuine patient care, which were directed to both Tree of Life and Fine Care Pharmacy.

23.     John Doe Defendants "1" – "10" reside in and are citizens of New York.  John Doe Defendants "1" – "10" include persons who are presently not identifiable but who are associated with (i) the Pharmacy Provider Defendants, Aronov, and Ballas and who conspired with them to further the fraudulent scheme committed against GEICO other New York automobile insurers; and (ii) the No-Fault Clinics and who conspired with Pharmacy Provider Defendants, Aronov, and Ballas to further the fraudulent scheme committed against GEICO and other New York automobile insurers.

**JURISDICTION AND VENUE**

24.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

25.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over claims brought under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States

26.    In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

27.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Amended Complaint occurred.

## III.    Allegations Common to All Claims

### A.    An Overview of New York's No-Fault Laws

28.    GEICO underwrites automobile insurance in the State of New York.

29.    New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.) (collectively, referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to the Insureds.

30.    No-Fault Benefits include up to $50,000.00 per Insured for expenses that are incurred for necessary healthcare goods and services.

31.    An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3"). In the alternative, healthcare providers sometimes submit claims using the Health Care Financing

Administration insurance claim form (known as the "HCFA-1500 Form").

32.    Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

33.    The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

34.    In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed providers may practice a profession in New York because of the concern that unlicensed persons are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

35.    Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

36.    Pharmacies "may be held liable for medically unnecessary services" submitted to No-Fault insurers similar to other "downstream providers." See Gov't Emples. Ins. Co. v.

Advanced Comp. Lab., L.L.C., 2020 WL 7042648 (E.D.N.Y. 12/1/2020); 2020 U.S. Dist. LEXIS 224868 (E.D.N.Y. 12/1/2020); Gov't Emples. Ins. Co. v. Wellmart RX, Inc., 435 F. Supp. 3d 443 (E.D.N.Y. 2020). See also Long Is. Radiology v. Allstate Ins. Co., 36 A.D.3d 763, 764 (2d Dept. 2007).

### B.    An Overview of Applicable Licensing Laws

37.    Pursuant to New York Education Law § 6808(1), no person, firm, corporation or association shall possess drugs, prescriptions or poisons for the purpose of compounding, dispensing, retailing, wholesaling or manufacturing, or shall offer drugs, prescriptions or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer or outsourcing facility.

38.    Pursuant to 8 N.Y.C.R.R. § 29.1, pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

39.    Similarly, 8 N.Y.C.R.R. § 29.1 prohibits pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

40.    Pursuant to 8 N.Y.C.R.R. § 63.1(7), pharmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

41.     New York Education Law § 6810 prohibits pharmacies from dispensing when a prescription form for a drug includes any other drug.  Separate prescriptions are required for each drug prescribed and dispensed.

42.     New York Education Law § 6810 prohibits persons and corporations not licensed to issue a prescription to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

43.     New York Education Law § 6530(17) prohibits a physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party.

44.     New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

45.     New York Education Law § 6509-a, prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications.

46.     Pursuant to New York Education Law § 6808(2)(c), "[t]he names of the owner or owners of a pharmacy shall be conspicuously displayed upon the exterior of such establishment. The names so displayed shall be presumptive evidence of ownership of such pharmacy by such person or persons."

47.     Pursuant to New York Education Law § 6808(2)(e), pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

48.    Pursuant to New York Education Law § 6808(2)(e), every pharmacy shall be under the immediate supervision and management of a licensed pharmacist.

49.    Pursuant to New York Education Law § 6808(2)(a)(3), a pharmacy must be equipped with facilities, apparatus, utensils and stocks of drugs and medicines sufficient to permit the prompt and efficient compounding and dispensing of prescriptions.

50.    Pursuant to New York Education Law § 6808(2)(e), pharmacy owners are responsible "for the strength, quality, purity and the labeling thereof of all drugs, toxic substances, devices and cosmetics, dispensed or sold, subject to the guaranty provisions of this article and the public health law."

51.    Pursuant to New York Education Law § 6808(2)(h), "an applicant for registration as a pharmacy shall be of good moral character."

## IV.    The Defendants' Scheme Involving the Fraudulent Pharmaceuticals

### A.    Overview of the Scheme

52.    Beginning in 2023, and continuing through the present day, Defendants implemented a fraudulent scheme in which they used the Pharmacy Provider Defendants to exploit patients for financial gain by billing GEICO and the New York automobile insurance industry millions of dollars in exorbitant charges relating to Fraudulent Pharmaceuticals purportedly dispensed to Insureds.

53.    Tree of Life Rx and Fine Care Pharmacy present themselves as independent, locally-owned neighborhood pharmacies operating in and catering to the local community in Brooklyn, New York, when in fact, the Defendants began using Tree of Life Rx in 2023, and subsequently Fine Care Pharmacy in 2024, as part of a large-scale No-Fault fraud scheme that exploited GEICO's Insureds, as well as insureds of other New York automobile insurers, through the prescribing and dispensing of the Fraudulent Pharmaceuticals, while intentionally

disregarding a vast array of prescription and over-the-counter ("OTC") medications readily available at a fraction of the cost.

54.     Defendants Aronov and Ballas (collectively, the "Record Owner Defendants") purported to be the sole owners of the Pharmacy Provider Defendants, but others presently not identifiable (*i.e*., the John Doe Defendants) exercised ownership and control over the Pharmacy Provider Defendants despite the fact they were not owners of record.

55.     Tree of Life Rx has been registered and operated as a pharmacy with New York State since 2020 but submitted no billing to GEICO at all in 2020 or 2022, and submitted minimal billing to GEICO in 2021.

56.     Fine Care Pharmacy has been registered and operated as a pharmacy with New York State since 2017 but submitted no billing to GEICO at all until 2024.

57.     However, in or about early 2023 and 2024, Aronov and Ballas, respectively, joined and/or capitalized upon their involvement in a network of individuals and entities regularly involved in No-Fault insurance fraud who were familiar with the suspect No-Fault Clinics and could arrange for fraudulent claims to be billed and collected as quickly as possible from New York automobile insurance companies to generate large profits without regard to genuine patient care.

58.     As a result of their involvement with the network, which included a collection law firm, a purported No-Fault billing company, and a purported pharmaceutical delivery company, all located in Brooklyn, New York, the Defendants began targeting and receiving large volumes of prescriptions for the Fraudulent Pharmaceuticals without regard to actual patient care.

59.     The Fraudulent Pharmaceuticals targeted by the Defendants overwhelmingly

included the Fraudulent Topical Pain Products; specifically Fraudulent Topical Lidocaine, which the Pharmacy Provider Defendants dispensed with charges typically of $1,524.00, $1,694.00, or $1,680.99 per prescription, and Fraudulent Topical Diclofenac, which the Pharmacy Provider Defendants dispensed with charges typically of $1,886.40 or $1,888.00 per prescription.

60.     The Defendants chose these products – Fraudulent Topical Diclofenac and Fraudulent Topical Lidocaine – because they could acquire them at low cost and submit claims for reimbursement to GEICO at exorbitant prices after illegally steering prescriptions to themselves.  Not surprisingly, the Office of the Inspector General of the U.S. Department of Health and Human Services has noted that Diclofenac and Lidocaine have been two of the most common products subject to fraud and abuse by pharmacies with questionable billing. See, Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018).

61.     In keeping with the fact that the Defendants commenced a scheme to exploit the No-Fault insurance system, Tree of Life Rx began in early 2023 to suddenly dispense and bill GEICO for voluminous amounts of the two exorbitantly priced Fraudulent Topical Pain Products allegedly dispensed to GEICO Insureds.

62.     More specifically, from January 18, 2023 through January 8, 2024 the Defendants submitted over $1.15 million in fraudulent claims to GEICO through Tree of Life Rx. Of that amount, approximately $990,000.00 was billed between May and December of 2023. Nearly 81% of the billing submitted through Tree of Life Rx from 2023 to present was for Fraudulent Topical Pain Products. Tree of Life Rx dispensed Fraudulent Topical Lidocaine to approximately 95% of its patients and dispensed Fraudulent Topical Diclofenac to approximately 70% of its patients.

63.     Tree of Life Rx, after suddenly and quickly billing voluminous amounts of the Fraudulent Topical Pain Products, abruptly ceased billing GEICO in January 2024.

64.     Thereafter, Fine Care Pharmacy began, in early 2024, to dispense and bill for voluminous amounts of the Fraudulent Topical Pain Products, which were allegedly dispensed to GEICO Insureds.

65.     More specifically, from January 11, 2024 through November 25, 2024 the Defendants submitted over $1.3 million in fraudulent claims to GEICO through Fine Care Pharmacy. Approximately 96% of the billing submitted through Fine Care Pharmacy was for the Fraudulent Topical Pain Products. Fine Care Pharmacy dispensed Fraudulent Topical Lidocaine to approximately 100% of its patients and dispensed Fraudulent Topical Diclofenac to approximately 100% of its patients.

66.     Fine Care Pharmacy, after suddenly and quickly billing voluminous amounts of the Fraudulent Topical Pain Products, abruptly ceased billing GEICO in November 2024.

67.     Overall, in just twenty-two months, the Defendants submitted to GEICO over $2.2 million in claims for Fraudulent Topical Pain Products through the Pharmacy Provider Defendants.

68.     The Defendants submitted the fraudulent billing through each of the Pharmacy Provider Defendants for only a short time collecting as much reimbursement as possible, as quickly as possible, before abruptly ceasing active operations of each pharmacy in order to evade detection by GEICO of the Defendants' integrated scheme to profit from the fraudulent billing.

69.     The onset of the Defendants' scheme in early 2023 resulted in Tree of Life Rx, and subsequently Fine Care Pharmacy, suddenly receiving voluminous prescriptions from NP Houslin, other Prescribers, and Clinic Controllers who work at or are associated with various

No-Fault Clinics.

70.    The sudden, huge increase in billing from the Pharmacy Provider Defendants for the Fraudulent Topical Pain Products and other Fraudulent Pharmaceuticals coincided with the Defendants' association with Billing Experts Inc. ("Billing Experts"), Drug Lift Corp. ("Drug Lift"), Gary Tsirelman PC (the "Tsirelman PC"), and NP Houslin, the other Prescribers, and Clinic Controllers, whereby the Pharmacy Provider Defendants were steered large volumes of medically unnecessary prescriptions for the specifically targeted Fraudulent Pharmaceuticals, which were purportedly prescribed and dispensed to patients at the No-Fault Clinics.

71.    The Record Owner Defendants themselves are not pharmacists, and, upon information and belief, are unaware of material aspects of the operations of the Pharmacy Provider Defendants' No-Fault insurance portion of their business.  For example, Aronov was unaware of the fact that Tree Of Life Rx received purported telephone prescriptions, while also being unaware that Tree Of Life Rx often purchased Fraudulent Topical Lidocaine and Fraudulent Topical Diclofenac on a cash basis from a wholesaler that is not registered with New York State.

72.    In keeping with the fact that the Pharmacy Provider Defendants were operated by the Defendants, including the John Doe Defendants, as part of an integrated scheme aimed at defrauding New York automobile insurers, all bills submitted to GEICO by the purportedly separately owned Pharmacy Provider Defendants were mailed or faxed by a single company – Billing Experts – and each of the pharmacy's billing submissions were largely identical. In addition, the Pharmacy Provider Defendants used the same collection law firm – the Tsirelman, P.C. – which continues to actively seek collection on the fraudulent No-Fault insurance billing on behalf of each of the Pharmacy Provider Defendants.

73.     Indeed, the purportedly separately owned Pharmacy Provider Defendants both use Tsirelman, P.C. to pursue collection from GEICO on the bills for the Fraudulent Pharmaceuticals in piecemeal fashion, primarily through numerous, individual civil court lawsuits, that are designed to obscure the fraud and monetize the scheme as quickly as possible. Tsirelman, P.C. routinely files expensive and time-consuming collection proceedings against GEICO and other insurers if the charges are not promptly paid in full. In fact, the Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that the Pharmacy Provider Defendants engaged in fraud.

74.     In further keeping with the fact that the Pharmacy Provider Defendants operated as part of an integrated scheme, the Pharmacy Provider Defendants dispensed Fraudulent Pharmaceuticals to the same Insureds over the course of the Insureds' treatments as the Defendants abruptly started and stopped each pharmacy's operations in order to avoid detection of their fraudulent scheme.  For example,

- Insured BM was allegedly involved in a motor vehicle accident on June 13, 2023.

    - Tree of Life Rx billed for:

        - Cyclobenzaprine, Naproxen, and Fraudulent Topical Lidocaine purportedly dispensed to BM on June 23, 2023,

        - Cyclobenzaprine and Fraudulent Topical Lidocaine purportedly dispensed to BM on July 20, 2023, and

        - Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Cyclobenzaprine, and Ibuprofen purportedly dispensed to BM on December 4, 2023.

    - Fine Care Pharmacy, for the same Insured, billed for:

        - Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Cyclobenzaprine, and Ibuprofen purportedly dispensed to BM on January 11, 2024.

- Insured SP was allegedly involved in a motor vehicle accident on June 20, 2023.

- Tree of Life Rx billed for:

  - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen-Famotidine purportedly dispensed to SP on July 15, 2023,

  - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen-Famotidine purportedly dispensed to SP on September 14, 2023,

  - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to SP on October 7, 2023, and

  - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to SP on November 10, 2023.

- Fine Care Pharmacy, for the same Insured, billed for:

  - Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Cyclobenzaprine, and Ibuprofen purportedly dispensed to SP on January 12, 2024,

  - Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Cyclobenzaprine, and Ibuprofen purportedly dispensed to SP on February 24, 2024, and

  - Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Cyclobenzaprine, and Ibuprofen purportedly dispensed to SP on and May 21, 2024.

- Insured DV was allegedly involved in a motor vehicle accident on October 19, 2023.

  - Tree of Life Rx billed for:

    - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, and Ibuprofen purportedly dispensed to DV on October 28, 2023, and

    - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to DV on December 23, 2023.

  - Fine Care Pharmacy, for the same Insured, billed for:

    - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to DV on

January 29, 2024, and

- Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to DV on March 6, 2024.

- Insured MV was allegedly involved in a motor vehicle accident on October 19, 2023.

  - Tree of Life Rx billed for:

    - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to MV on October 26, 2023, and

    - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to MV on December 9, 2023.

  - Fine Care Pharmacy, for the same Insured, billed for:

    - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to MV on January 29, 2024.

- Insured MF was allegedly involved in a motor vehicle accident on October 5, 2023.

  - Tree of Life Rx billed for:

    - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to MF on October 19, 2023, and

    - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to MF on December 2, 2023.

  - Fine Care Pharmacy, for the same Insured, billed for:

    - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to MF on February 21, 2024,

    - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Ibuprofen and Cyclobenzaprine purportedly dispensed to MF on April 6, 2024, and

    - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine,

Naproxen, and Cyclobenzaprine purportedly dispensed to MF on June 24, 2024.

- Insured RL was allegedly involved in a motor vehicle accident on August 7, 2023.

    - Tree of Life Rx billed for:

        - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen-Famotidine purportedly dispensed to RL on September 1, 2023,

        - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to RL on November 20, 2023, and

        - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to RL on January 8, 2024.

    - Fine Care Pharmacy, for the same Insured, billed for:

        - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to RL on January 23, 2024.

- Insured AAG was allegedly involved in a motor vehicle accident on October 5, 2023.

    - Tree of Life Rx billed for:

        - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, and Acetaminophen purportedly dispensed to AAG on October 20, 2023,

        - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, and Acetaminophen purportedly dispensed to AAG on November 10, 2023, and

        - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, and Acetaminophen, purportedly dispensed to AAG on December 22, 2023.

    - Fine Care Pharmacy, for the same Insured, billed for:

        - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, and Acetaminophen, purportedly dispensed to AAG on January 30, 2024, and

- Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, and Acetaminophen, purportedly dispensed to AAG on February 24, 2024.

- Insured DD was allegedly involved in a motor vehicle accident on September 29, 2023.

  - Tree of Life Rx billed for:

    - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to DD on November 7, 2023.

  - Fine Care Pharmacy, for the same Insured, billed for:

    - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to DD on January 24, 2024, and

    - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to DD on February 12, 2024.

- Insured WB was allegedly involved in a motor vehicle accident on June 1, 2023.

  - Tree of Life Rx billed for:

    - Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Butalbital-Acetaminophen, Ibuprofen-Famotidine, and Cyclobenzaprine purportedly dispensed to WB on June 7, 2023,

    - Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, and Cyclobenzaprine purportedly dispensed to WB on August 18, 2023,

    - Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Acetaminophen, and Cyclobenzaprine purportedly dispensed to WB on October 21, 2023, and

    - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Butalbital-Acetaminophen purportedly dispensed to WB on November 16, 2023.

  - Fine Care Pharmacy, for the same Insured, billed for:

    - Fraudulent Topical Lidocaine and Fraudulent Topical Diclofenac purportedly dispensed to WB on January 24, 2024, and

- Fraudulent Topical Diclofenac and Fraudulent Topical Lidocaine purportedly dispensed to WB on February 24, 2024.

- Insured ID was allegedly involved in a motor vehicle accident on September 9, 2023.

  - Tree of Life Rx billed for:

    - Fraudulent Topical Lidocaine and Cyclobenzaprine purportedly dispensed to ID on September 22, 2023, and

    - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to ID on November 10, 2023.

  - Fine Care Pharmacy, for the same Insured, billed for:

    - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to ID on January 17, 2024.

- Insured AJ was allegedly involved in a motor vehicle accident on November 29, 2023.

  - Tree of Life Rx billed for:

    - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to AJ on December 9, 2023.

  - Fine Care Pharmacy, for the same Insured, billed for:

    - Fraudulent Topical Diclofenac, Cyclobenzaprine, and Ibuprofen purportedly dispensed to AJ on January 25, 2024,

    - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to AJ on February 10, 2024, and

    - Fraudulent Topical Lidocaine and Fraudulent Topical Diclofenac purportedly dispensed to AJ on March 23, 2024.

- Insured LC was allegedly involved in a motor vehicle accident on October 21, 2023.

  - Tree of Life Rx billed for:

    - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to LC on

December 21, 2023.

- Fine Care Pharmacy, for the same Insured, billed for:

  - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to LC on January 17, 2024, and

  - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to LC on February 12, 2024.

- Insured MHL was allegedly involved in a motor vehicle accident on August 4, 2023.

  - Tree of Life Rx billed for:

    - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, and Cyclobenzaprine purportedly dispensed to MHL on August 25, 2023,

    - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to MHL on October 23, 2023, and

    - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to MHL on December 6, 2023.

  - Fine Care Pharmacy, for the same Insured, billed for:

    - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to MHL on January 24, 2024,

    - Cyclobenzaprine and Ibuprofen purportedly dispensed to MHL on April 2, 2024, and

    - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to MHL on May 11, 2024.

- Insured EM was allegedly involved in a motor vehicle accident on October 13, 2023.

  - Tree of Life Rx billed for:

    - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine,

Cyclobenzaprine, and Ibuprofen purportedly dispensed to EM on October 26, 2023, and

- Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to EM on December 21, 2023.

▪ Fine Care Pharmacy, for the same Insured, billed for:

- Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to EM on January 24, 2024.

- Insured KB was allegedly involved in a motor vehicle accident on October 3, 2023.

  ▪ Tree of Life Rx billed for:

  - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to KB on October 20, 2023, and

  - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to KB on December 11, 2023.

  ▪ Fine Care Pharmacy, for the same Insured, billed for:

  - Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Ibuprofen purportedly dispensed to KB on January 17, 2024.

75.    In further keeping with the fact that the Pharmacy Provider Defendants operated as part of an integrated scheme, the Defendants billed for Fraudulent Pharmaceuticals dispensed to many common Insureds pursuant to their illegal, collusive agreements with NP Houslin, the other Prescribers, and the Clinic Controllers at the No-Fault Clinics whereby the Defendants steered them to direct large volumes of prescriptions to the Pharmacy Provider Defendants for the targeted Fraudulent Topical Pain Products.

76.    As further evidence that the Pharmacy Provider Defendants operated as part of an integrated scheme, the Pharmacy Provider Defendants each received the significant majority

of their prescriptions from NP Houslin. In fact, NP Houslin was responsible for approximately 66% of the billing submitted to GEICO by Tree of Life, and approximately 97% of the billing submitted to GEICO by Fine Care Pharmacy.

77.    NP Houslin is an employee of Atlantic Medical. Notably, Atlantic Medical is owned by Jonathan Landow, M.D. ("Dr. Landow"). Dr. Landow and several of his professional corporations, including Macintosh Medical, have been named as defendants in multiple No-Fault insurance fraud cases.    See Government Employees Ins. Co. et al v. Landow, et al, 1:21-cv-01440 (NGG-RER)(E.D.N.Y. 2021); Allstate Insurance Co., et al, v. Landow, et al., 1:24-cv-02010 (DLI-JRC) (E.D.N.Y. 2024); United Services Automobile Association, et al, v. Landow, et al, 1-24-cv-03471 (NRM-MMH) (E.D.N.Y. 2024).

78.    The Pharmacy Provider Defendants obtained medically unnecessary prescriptions from NP Houslin, the other Prescribers, and Clinic Controllers at the No-Fault Clinics in exchange for kickbacks and pursuant to predetermined treatment protocols designed to exploit motor vehicle accident victims.

79.    In keeping with the fact that the Defendants were part of an integrated scheme, the Pharmacy Provider Defendants consistently received prescriptions from several of the same No-Fault Clinics even though the pharmacies technically had separate physical locations in Kings County and purported to operate separately.

80.    For example, pursuant to the fraudulent scheme and collusive arrangements discussed, both Pharmacy Provider Defendants received the majority of the medically unnecessary prescriptions from the following common No-Fault Clinics: 108 Kenilworth Place Brooklyn, NY 11210 (the "Kenilworth Place Clinic") and 788 Southern Boulevard Bronx, NY 10455 (the "Southern Boulevard Clinic").

81.    These No-Fault Clinics present themselves to be legitimate healthcare practices when, in fact, they are medical mills that house a "revolving door" of numerous healthcare providers that subject Insureds to as many healthcare good and services as possible to exploit their No-Fault Benefits and submit large volumes of fraudulent claims to No-Fault insurers like GEICO.

82.    For example, GEICO has received billing in "revolving door" fashion from at least 150 different healthcare provider "names" for services rendered at the Southern Boulevard Clinic and at least 110 different healthcare provider "names" for services rendered at the Kenilworth Place Clinic.

83.    In keeping with the fact that the Defendants illegally steered NP Houslin, the other Prescribers, and Clinic Controllers at the No-Fault Clinics to provide the Pharmacy Provider Defendants with prescriptions for the Fraudulent Pharmaceuticals, Insureds were never given the option to use a pharmacy of their choosing.

84.    Instead, the Defendants colluded with NP Houslin, the other Prescribers, and Clinic Controllers to ensure they directed the prescriptions for the Fraudulent Pharmaceuticals to the Pharmacy Provider Defendants, regardless of the distance of the pharmacies from the Insureds or the No-Fault Clinics where they were treating.

85.    The Pharmacy Provider Defendants purported to deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes. However, at times, Fraudulent Pharmaceuticals were given to Insureds directly by the front desk staff at the No-Fault Clinics, without the Insureds receiving any instructions or counseling.

86.    Upon information and belief, at times the Insureds were not even aware a Fraudulent Pharmaceutical dispensed by the Pharmacy Provider Defendants was prescribed to

them until the medication was delivered to them or distributed to them by the front desk staff.

87.     Likewise, at times, Insureds received automatic refills of Fraudulent Pharmaceuticals, either delivered to their homes or given to them by the front desk staff at the No-Faut Clinics, without ever seeing a prescription or being advised that a refill was prescribed.

88.     Furthermore, at times, the Pharmacy Provider Defendants submitted claims for reimbursement to GEICO for medications that were never actually dispensed to the Insureds to whom they were purportedly prescribed.

89.     The Pharmacy Provider Defendants nevertheless represented they delivered the Fraudulent Pharmaceuticals to the Insureds' residences, regularly submitting a "delivery receipt" with the billing submitted to GEICO. As part of the integrated scheme, the Pharmacy Provider Defendants virtually always submitted the same exact form of delivery receipt, containing the following identical pre-printed language: "I certify that I requested and received by medication listed above from [Pharmacy Provider Defendant] located at [address of Pharmacy Provider Defendant]. I further certify that I had a patient relationship with the ordering medical provider indicated on the prescription label and that I requested that the prescriber send this prescription to the Pharmacy. The foregoing is certified as true and accurate under the penalty of perjury."

90.     As illustrated above, not only did the Pharmacy Provider Defendants operate in the same quick-hit fashion submitting hundreds of fraudulent claims to GEICO for Fraudulent Topical Lidocaine and Fraudulent Topical Diclofenac, often to the same Insureds, but they used the same billing company and virtually identical delivery receipts in support of their billing submissions; received the majority of their prescriptions from the same nurse practitioner; and used the same collection law firm to pursue payment from GEICO and other New York automobile insurers for their fraudulent claims.

91.     Defendants implemented their integrated pharmaceutical fraud scheme involving the Pharmacy Provider Defendants, along with NP Houslin, the other Prescribers, and the Clinic Controllers, knowing that (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined protocols designed to exploit the patients for financial gain, without regard to genuine patient care; (ii) the Defendants inflated the charges to GEICO by intentionally targeting specific pharmaceutical products (i.e., the Fraudulent Topical Lidocaine and the Fraudulent Topical Diclofenac) that they acquired at low cost and dispensed in large volumes to Insureds at inflated charges; (iii) the Fraudulent Pharmaceuticals were the product of illegal, collusive arrangements intended to inflate the billing from the Pharmacy Provider Defendants to insurers and to financially enrich the Defendants; and (iv) the Fraudulent Pharmaceuticals were prescribed and dispensed without regard for the availability of a wide range of other prescription and over-the-counter medications proven to have therapeutic effects and available at a fraction of the cost.

92.     NP Houslin, the other Prescribers, and Clinic Controllers would not have engaged in the illegal, collusive arrangements with the Defendants in violation of New York law, including intentionally prescribing the Fraudulent Pharmaceuticals, and directing those prescriptions to the Pharmacy Provider Defendants, unless they profited from their participation in the illegal scheme either by way of direct kickbacks or other financial incentives, such as employment at a No-Fault Clinic.

**B.  The Fraudulent Pharmaceuticals Were Prescribed and Dispensed for Financial Gain Without Genuine Regard for Patient Care**

93.     In basic terms, the goal of medical treatment is to help patients get better in a timely manner. Notwithstanding this basic goal, Insureds treated by NP Houslin and the other Prescribers at the No-Fault Clinics associated with the Clinic Controllers – and who received

pharmaceuticals from the Pharmacy Provider Defendants – were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

94.     Evidence-based best practices guidelines for the treatment of acute and chronic pain do exist and should always guide prescribing habits. For example, the World Health Organization ("WHO") pain relief ladder recommends a non-opioid such as acetaminophen or an oral non-steroidal anti-inflammatory drug ("NSAID") for the initial management of pain. Oral NSAIDs are the most commonly prescribed analgesic medications worldwide, and their efficacy for treating acute pain has been well demonstrated. If pain relief is not achieved, and doses are maximized, then an adjuvant oral agent may be added to the medication regimen – including the use of muscle relaxers and medications that block neuropathic pain transmission. Finally, opiates may be prescribed for short-term, limited use.

95.     More recently, in 2019 the Department of Health & Human Services ("DHHS") issued a Pain Management Best Practices Inter-Agency Task Force Report which focused on pain management and the treatment of acute and chronic pain.  According to the DHHS report, such pain should be treated using an individualized, multimodal approach which may include prescription medications depending on various biological, psychological, and social factors of an individual patient, including, but not limited to, a patient's age, medical history, pain tolerance, genetics and neurological factors, stress level, coping ability, social support, and even education and cultural factors. A risk-benefit analysis should be applied to each patient prior to determining whether a medication is clinically appropriate.  Like the WHO pain relief ladder, the DHHS report indicates that non-opioids (e.g., oral NSAIDs) should be used as first line

therapy for patients for whom medications are clinically appropriate.

96.     Like the WHO and DHHS, the New York State Workers' Compensation Board's ("NYS WCB") published medical treatment guidelines state that oral NSAIDs are recommended as first-line medications for the treatment of neck and back pain, and that over-the-counter medications should be tried prior to prescription NSAIDs. See New York State Workers' Compensation Board Medical Treatment Guidelines, Mid and Lower Back Injury (May 2022, p. 36); New York State Workers' Compensation Board Medical Treatment Guidelines, Mid and Lower Back Injury (May 2022, p. 32).

97.     Notably, for a drug to alleviate pain it must reach nerve or tissue receptors responsible for producing or transmitting a person's sensation of pain.

98.     Oral pain relievers reduce or alleviate pain by entering the bloodstream through the gastrointestinal system and traveling to the relevant nerve or tissue receptors. Some of the limited circumstances in which a physician would prescribe a topical medication include patients in whom these oral medications are contraindicated. For example – patients with moderate to severe kidney or liver dysfunction, or those with comorbidities that preclude the use of oral NSAIDs (e.g., history of peptic ulcer disease, coronary artery disease, or congestive heart failure).

99.     Despite these guidelines and the basic goal of helping patients get better in a timely fashion, the Insureds who received pharmaceuticals from the Pharmacy Provider Defendants, and who were treated by NP Houslin and/or the other Prescribers at the No-Fault Clinics associated with the Clinic Controllers, were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the

Insureds' timely return to good health.

100.    Pursuant to these predetermined protocols, NP Houslin and the other Prescribers produced generic, preprinted, and boilerplate examination reports designed to justify continued, voluminous, and excessive healthcare services that the healthcare providers at the various No-Fault Clinics purported to render to Insureds – including the prescription of excessive and medically unnecessary pharmaceutical drug products.

101.    Notwithstanding the creation of the examination reports, NP Houslin and the other Prescribers' prescriptions for the Fraudulent Pharmaceuticals dispensed by the Pharmacy Provider Defendants were based on predetermined protocols designed to exploit Insureds for financial gain, without regard to the genuine needs of the patients.

102.    Indeed, the manner in which the Insureds were prescribed and dispensed the Fraudulent Pharmaceuticals reflects a protocol driven scheme with little to no relationship to the patients' clinical needs or patient history, deviates from the medical standards of care, and demonstrates a gross indifference to patient health and safety.

103.    Prescribing a multitude of pharmaceutical drug products based on generic, preprinted, and boilerplate examination reports lacking a detailed patient history demonstrates a gross indifference to patient health and safety.

104.    The Prescribers also did not document in their examination reports whether the patients were intolerant of oral medications or tried and failed any over-the-counter topical medications necessitating a prescription for Fraudulent Topical Lidocaine and/or Fraudulent Topical Diclofenac dispensed by one or more of the Pharmacy Provider Defendants.

105.    The Prescribers also frequently failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to a particular patient and dispensed

by the Pharmacy Provider Defendants were used by the patient and, if so, whether they provided any pain relief or were otherwise effective for the purpose prescribed.

106.    In keeping with the need for individualized care, each patient that has, or is in, an accident, including motor vehicle accidents, is exposed to a set of unique mechanical events and their injuries are a direct result of those specific forces, hence their injuries are unique. In addition, an individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact will all affect whether, how, and to what extent an individual is injured in a given motor vehicle accident.

107.    Despite the fact that the Insureds were of different ages, heights, weights, and in different physical conditions, and likely reacted to the accidents in different ways, virtually all of these individuals were unnecessarily prescribed large quantities of Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, and other Fraudulent Pharmaceuticals in an excessive and systematic manner.

108.    It is extremely improbable that multiple Insureds involved in the same motor vehicle accident would often require the same pharmaceutical products in voluminous quantities. Even so, pursuant to the fraudulent and collusive arrangements, and as demonstrated herein, NP Houslin and the other Prescribers prescribed, and the Pharmacy Provider Defendants purported to dispense, the same set of Fraudulent Pharmaceuticals to multiple Insureds involved in a single motor vehicle accident, without regard to individualized, genuine patient care.  For example:

- On June 21, 2023, two Insureds – LA and RL were involved in the same motor vehicle accident.  Thereafter, LA and RL received, or allegedly received, examinations from a nurse practitioner associated with Atlantic Medical.  LA and RL were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, LA and RL were directed to take the same Fraudulent Pharmaceuticals, which were dispensed by Tree of Life. In particular:

  o On July 19, 2023, four (4) prescriptions were allegedly issued to LA by NP Houslin

for Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Duexis and Cyclobenzaprine, which were dispensed and billed for by Tree of Life;

o On July 19, 2023, four (4) prescriptions were allegedly issued to RL by NP Houslin for Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Duexis, and Cyclobenzaprine which were dispensed and billed for by Tree of Life;

o On August 16, 2023, four (4) prescriptions were allegedly issued to LA by NP Houslin for Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Duexis, and Cyclobenzaprine, which were dispensed and billed for by Tree of Life; and

o On August 22, 2023, four (4) prescriptions were allegedly issued to RL by NP Houslin for Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Duexis, and Cyclobenzaprine which were dispensed and billed for by Tree of Life.

- On February 9, 2023, two Insureds – PM and JP were involved in the same motor vehicle accident. Thereafter, PM and JP received, or allegedly received, examinations from a nurse practitioner and physician's assistant associated with Atlantic Medical. PM and JP were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, PM and JP were directed to take the same Fraudulent Pharmaceuticals, which were dispensed by Tree of Life. In particular:

o On February 15, 2023, four (4) prescriptions were allegedly issued to PM by Amira Nasser PA ("PA Nasser") for Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Naproxen, which were dispensed and billed for by Tree of Life; and

o On February 15, 2023, four (4) prescriptions were allegedly issued to JP by PA Nasser for Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Cyclobenzaprine, and Naproxen, which were dispensed and billed for by Tree of Life.

- On April 18, 2023, two Insureds – JF and JH - were involved in the same motor vehicle accident. Thereafter, JF and JH received, or allegedly received, examinations from a nurse practitioner associated with Atlantic Medical. JF and JH were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, JF and JH were directed to take the same Fraudulent Pharmaceuticals, which were dispensed by Tree of Life. In particular:

o On May 17, 2023, four (4) prescriptions were allegedly issued to JF by NP Houslin for Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Cyclobenzaprine, and Duexis which were dispensed and billed for by Tree of Life; and

o On May 17, 2023, four (4) prescriptions were allegedly issued to JH by NP Houslin for Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac,

Cyclobenzaprine, and Duexis which were dispensed and billed for by Tree of Life.

- On January 1, 2023 two insureds – LS and WT – were involved in the same motor vehicle accident. Thereafter, LS and WT received, or allegedly received, examinations from a nurse practitioner associated with Atlantic Medical. LS and WT were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, LS and WT were directed to take the same Fraudulent Pharmaceuticals, which were dispensed by Tree of Life. In particular:

  o On February 15, 2023 two (2) prescriptions were allegedly issued to LS by PA Nasser for Fraudulent Topical Lidocaine and Fraudulent Topical Diclofenac which were dispensed and billed for by Tree of Life; and

  o On February 15, 2023 two (2) prescriptions were allegedly issued to WT by PA Nasser for Fraudulent Topical Lidocaine and Fraudulent Topical Diclofenac which were dispensed and billed for by Tree of Life.

- On October 23, 2023 two insureds – MF and RM – were involved in the same motor vehicle accident. Thereafter, MF and RM received, or allegedly received, examinations from a nurse practitioner associated with Atlantic Medical. MF and RM were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, MF and RM were directed to take the same Fraudulent Pharmaceuticals, which were dispensed by Tree of Life. In particular:

  o On November 22, 2023 four (4) prescriptions were allegedly issued to MF by NP Houslin for Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Ibuprofen, and Cyclobenzaprine which were dispensed and billed for by Tree of Life; and

  o On October 27, 2023 four (4) prescriptions were allegedly issued to RM by NP Houslin for Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Ibuprofen, and Cyclobenzaprine which were dispensed and billed for by Tree of Life.

- On April 22, 2024 three insureds – SN, JH, and RD – were involved in the same motor vehicle accident. Thereafter, SN, JH, and RD received, or allegedly received, examinations from a nurse practitioner associated with Atlantic Medical. SN, JH, and RD were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, SN, JH, and RD were directed to take the same Fraudulent Pharmaceuticals, which were dispensed by Fine Care Pharmacy. In particular:

  o On April 24, 2024 four (4) prescriptions were allegedly issued to SN by NP Houslin for Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Ibuprofen, and Cyclobenzaprine, which were dispensed and billed for by Fine Care Pharmacy;

  o On April 24, 2024 four (4) prescriptions were allegedly issued to JH by NP Houslin for Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Ibuprofen, and

Cyclobenzaprine, which were dispensed and billed for by Fine Care Pharmacy; and

- o On April 24, 2024 four (4) prescriptions were allegedly issued to RD by NP Houslin for Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Ibuprofen, and Cyclobenzaprine, which were dispensed and billed for by Fine Care Pharmacy.

- On June 11, 2024, two insureds – KN and TN – were involved in the same motor vehicle accident. Thereafter, KN and TN underwent examinations with NP Houslin at Atlantic Medical. KN and TN were in different physical conditions and experienced the impact form different positions in the vehicle. Nonetheless, KN and TN were prescribed the same Fraudulent Pharmaceuticals, which were dispensed by Fine Care Pharmacy, in particular:

  - o On June 12, 2024, four (4) prescriptions were allegedly issued to KN by NP Houslin for Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Ibuprofen, and Cyclobenzaprine, which were dispensed and billed for by Fine Care Pharmacy; and

  - o On June 12, 2024, four (4) prescriptions were allegedly issued to TN by NP Houslin for Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Ibuprofen, and Cyclobenzaprine, which were dispensed and billed for by Fine Care Pharmacy.

- On March 23, 2024 two insureds – EC and VI – were involved in the same motor vehicle accident. Thereafter, EC and VI underwent examinations with NP Houslin at Atlantic Medical. EC and VI were in different physical conditions and experienced the impact form different positions in the vehicle. Nonetheless, EC and VI were prescribed the same Fraudulent Pharmaceuticals, which were dispensed by Fine Care Pharmacy, in particular:

  - o On March 27, 2024, four (4) prescriptions were allegedly issued to EC by NP Houslin for Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Ibuprofen, and Cyclobenzaprine, which were dispensed and billed for by Fine Care Pharmacy; and

  - o On April 3, 2024, four (4) prescriptions were allegedly issued to VI by NP Houslin for Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Ibuprofen, and Cyclobenzaprine, which were dispensed and billed for by Fine Care Pharmacy.

- On February 23, 2024 two insureds – DS and ST – were involved in the same motor vehicle accident. Thereafter, DS and ST underwent examinations with NP Houslin at Atlantic Medical. DS and ST were in different physical conditions and experienced the impact form different positions in the vehicle. Nonetheless, DS and ST were prescribed the same Fraudulent Pharmaceuticals, which were dispensed by Fine Care Pharmacy, in particular:

  - o On March 6, 2024, four (4) prescriptions were allegedly issued to DS by NP Houslin for Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Ibuprofen, and Cyclobenzaprine, which were dispensed and billed for by Fine Care Pharmacy; and

  - o On March 6, 2024, four (4) prescriptions were allegedly issued to ST by NP Houslin for Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Ibuprofen, and

Cyclobenzaprine, which were dispensed and billed for by Fine Care Pharmacy.

- On January 9, 2024 two insureds – AM  and EM – were involved in the same motor vehicle accident. Thereafter, AM and EM underwent examinations with NP Houslin at Atlantic Medical. AM and EM were in different physical conditions and experienced the impact form different positions in the vehicle. Nonetheless, AM and EM were prescribed the same Fraudulent Pharmaceuticals, which were dispensed by Fine Care Pharmacy, in particular:

  o On January 17, 2024, four (4) prescriptions were allegedly issued to AM by NP Houslin for Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Ibuprofen, and Cyclobenzaprine, which were dispensed and billed for by Fine Care Pharmacy; and

  o On January 17, 2024, four (4) prescriptions were allegedly issued to EM by NP Houslin for Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, Ibuprofen, and Cyclobenzaprine, which were dispensed and billed for by Fine Care Pharmacy.

109.    In further keeping with the fact NP Houslin, the other Prescribers, and Clinic Controllers prescribed, or caused to be prescribed, Fraudulent Pharmaceuticals pursuant to illegal kickbacks and pre-determined protocols, they routinely routed prescriptions issued to the same insured to multiple pharmacies throughout the course of a patient's treatment, pursuant to similar schemes as the one described herein. For example.

- Insured NM was allegedly involved in a motor vehicle accident on December 30, 2022. On January 29, 2023, R&M Pharmacy dispensed Naproxen, Baclofen, and Fraudulent Topical Lidocaine to NM pursuant to electronic prescriptions purportedly issued by PA Nasser on January 4, 2023. On February 10, 2023, Tree of Life dispensed Cyclobenzaprine, Fraudulent Topical Diclofenac, and Fraudulent Topical Lidocaine to NM pursuant to electronic prescriptions purportedly issued by PA Nasser on February 8, 2023. On May 22, 2023, Tree of Life dispensed Cyclobenzaprine, Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, and Ibuprofen-Famotidine to NM pursuant to electronic prescriptions purportedly issued by PA Jagga on May 17, 2023.

  The pharmaceutical charges alone submitted to GEICO for this Insured totaled $12,110.22 substantially reducing the $50,000.00 in No-Fault benefits available to the Insured for any legitimate, medically necessary healthcare services.

- Insured JA was allegedly involved in a motor vehicle accident on December 12, 2022. On December 22, 2023, Five Star Pharmacy Inc. ("Five Star")

billed for Lidothol 4.5-5% Pads dispensed to JA pursuant to an electronic prescription purportedly issued by Jean Pierre Barakat MD on December 14, 2023. On January 7, 2023, Five Star billed for Lidothol 4.5-5% Pads dispensed to JA pursuant to a prescription check off form and telephone prescription purportedly issued by Hong Pak MD ("Dr. Pak") on December 15, 2022. On January 12, 2023 S&K Warbasse Pharmacy Inc. ("S&K Warbasse") dispensed Fraudulent Topical Lidocaine and Celecoxib to JA pursuant to telephone prescriptions and prescription check off forms purportedly issued by Dr. Pak on December 15, 2022. On February 3, 2023, Tree of Life submitted two separate bills, one for Fraudulent Topical Lidocaine and Celecoxib and the other for Fraudulent Topical Lidocaine dispensed to JA pursuant to the same telephone prescriptions purportedly ordered by Dr. Pak on January 26, 2023.

The pharmaceutical charges alone submitted to GEICO for this Insured totaled $8,147.97 substantially reducing the $50,000.00 in No-Fault benefits available to the Insured for any legitimate, medically necessary healthcare services.

- Insured SUV was allegedly involved in a motor vehicle accident on August 21, 2022. On September 3, 2022, R&M Pharmacy LLC ("R&M") dispensed Fraudulent Topical Lidocaine to SUV pursuant to electronic prescriptions purportedly issued by Idy Liang NP ("NP Liang") on August 29, 2022. On December 4, 2022, R&M dispensed Naproxen and Cyclobenzaprine pursuant to electronic prescriptions purportedly issued by PA Nasser on December 1, 2022. On February 9, 2023, Ridgewood Drug Inc. ("Ridgewood Drug") dispensed Naproxen-Esomeprazole, Cephalexin, and Oxycodone-APAP pursuant to electronic prescriptions issued by Wendell Joseph Gorum MD ("Dr. Gorum") on February 8, 2023. On February 27, 2023, Tree of Life dispensed Naproxen and Cyclobenzaprine to SUV pursuant to electronic prescriptions issued by PA Nasser on February 8, 2023.

The pharmaceutical charges alone submitted to GEICO for this Insured totaled $3,364.02, substantially reducing the $50,000.00 in No-Fault benefits available to the Insured for any legitimate, medically necessary healthcare services.

- Insured ET was allegedly involved in a motor vehicle accident on December 15, 2022. On January 23, 2023, R&M dispensed Fraudulent Topical Lidocaine to ET pursuant to an electronic prescription purportedly issued by PA Nasser on December 28, 2022. On January 30, 2023, Tree of Life dispensed Naproxen, Fraudulent Topical Diclofenac, and Fraudulent Topical Lidocaine to ET pursuant to electronic prescriptions purportedly issued by PA Nasser on January 25, 2023. On March 28, 2023, Tree of Life dispensed Naproxen to ET pursuant to an electronic prescription purportedly issued by PA Nasser on March 15, 2023. On June 6, 2023, Tree

of Life dispensed Fraudulent Topical Diclofenac, Fraudulent Topical Lidocaine, and Cyclobenzaprine to ET pursuant to electronic prescriptions purportedly issued by NP Jagga on May 10, 2023.

The pharmaceutical charges alone submitted to GEICO for this Insured totaled $8,939.58 substantially reducing the $50,000.00 in No-Fault benefits available to the Insured for any legitimate, medically necessary healthcare services.

- Insured NR was allegedly involved in a motor vehicle accident on January 1, 2023. On December 9, 2023, Putnam Rx Inc. dispensed Cyclobenzaprine, Lidocaine 5% Film, and Naproxen to NR pursuant to electronic prescriptions purportedly issued by Sergio Diaz Manzano on December 7, 2023. On January 18, 2023, R&M dispensed Fraudulent Topical Lidocaine to NR pursuant to a prescription ordered by PA Nasser on January 4, 2023. On February 18, 2023, Tree of Life dispensed Fraudulent Topical Diclofenac and Fraudulent Topical Lidocaine to NR pursuant to electronic prescriptions purportedly issued by PA Nasser on February 15, 2023.

The pharmaceutical charges alone submitted to GEICO for this Insured totaled $7,797.42 substantially reducing the $50,000.00 in No-Fault benefits available to the Insured for any legitimate, medically necessary healthcare services.

- Insured LD was allegedly involved in a motor vehicle accident on September 15, 2024. On September 21, 2024, Fine Care Pharmacy dispensed Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Cyclobenzaprine, and Ibuprofen to LD pursuant to electronic prescriptions purportedly issued by NP Houslin on September 18, 2024. On October 25, 2024, Fine Care Pharmacy dispensed Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Cyclobenzaprine, and Ibuprofen to LD pursuant to electronic prescriptions purportedly issued by NP Houslin on October 21, 2024. On November 22, 2024, Levy's Pharmacy Inc. ("Levy's Pharmacy") dispensed Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Cyclobenzaprine, and Ibuprofen to LD pursuant to electronic prescriptions purportedly issued by NP Houslin on November 20, 2024.

The pharmaceutical charges alone submitted to GEICO for this Insured totaled $11,201.04 substantially reducing the $50,000.00 in No-Fault benefits available to the Insured for any legitimate, medically necessary healthcare services.

- Insured GF was allegedly involved in a motor vehicle accident on June 6, 2024. On July 20, 2024, Fine Care Pharmacy dispensed Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Cyclobenzaprine, and Ibuprofen to GF pursuant to electronic prescriptions purportedly issued by NP Houslin on July 17, 2024. On September 21, 2024, Fine Care Pharmacy dispensed

Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Cyclobenzaprine, and Ibuprofen to GF pursuant to electronic prescriptions purportedly issued by NP Houslin on September 16, 2024. On November 2, 2024, Fine Care Pharmacy dispensed Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Cyclobenzaprine, and Ibuprofen to GF pursuant to electronic prescriptions purportedly issued by NP Houslin on October 23, 2024. On November 23, 2024, Levy's Pharmacy dispensed Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Cyclobenzaprine, and Ibuprofen to GF pursuant to electronic prescriptions purportedly issued by NP Houslin on November 20, 2024.

The pharmaceutical charges alone submitted to GEICO for this Insured totaled $14,793.48 substantially reducing the $50,000.00 in No-Fault benefits available to the Insured for any legitimate, medically necessary healthcare services.

- Insured RB was allegedly involved in a motor vehicle accident on May 11, 2024. On June 1, 2024, Fine Care Pharmacy dispensed Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Cyclobenzaprine, and Ibuprofen to RB pursuant to electronic prescriptions purportedly issued by NP Houslin on May 29, 2024. On July 6, 2024, Fine Care Pharmacy dispensed Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Cyclobenzaprine, and Ibuprofen to RB pursuant to electronic prescriptions purportedly issued by NP Houslin on July 1, 2024. On August 17, 2024, Fine Care Pharmacy dispensed Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Cyclobenzaprine, and Ibuprofen to RB pursuant to electronic prescriptions purportedly issued by NP Houslin on August 12, 2024. On October 14, 2024, Fine Care Pharmacy dispensed Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Cyclobenzaprine, and Ibuprofen to RB pursuant to electronic prescriptions purportedly issued by NP Houslin on October 10, 2024. On November 22, 2024, Levy's Pharmacy dispensed Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Cyclobenzaprine, and Ibuprofen to RB pursuant to electronic prescriptions purportedly issued by NP Houslin on November 20, 2024.

The pharmaceutical charges alone submitted to GEICO for this Insured totaled $18,363.01 substantially reducing the $50,000.00 in No-Fault benefits available to the Insured for any legitimate, medically necessary healthcare services.

110.    There is no plausible explanation for Prescribers and Clinic Controllers to split prescriptions issued to a single patient, often by the same Prescriber, among multiple pharmacies other than their involvement in illegal collusive arrangements with various pharmacies throughout the New York City area, all aimed at profiting from the $50,000.00 in No-Fault

benefits available to each Insured as quickly as possible.

111.    In further keeping with the fact that the Fraudulent Pharmaceuticals were prescribed, dispensed, and billed pursuant to fraudulent, predetermined protocols and collusive arrangements, the Defendants at times submitted purported "telephone prescriptions" or pre-printed, "checklist prescriptions" in support of fraudulent claims for reimbursement.

112.    As of March 27, 2016, to combat the growing problem of prescription fraud, N.Y. Public Health Law requires that all prescriptions issued in New York State – for both controlled and non-controlled substances – must be prescribed electronically.

113.    In the limited circumstances in which a prescription is exempt from the electronic prescription requirement, N.Y. Public Health Law requires that a written prescription in New York State be written on an official serialized New York State prescription blank bearing the prescriber's signature as well as the legible, conspicuous imprinted or stamped name of the authorized prescribing healthcare provider.  See N.Y. Public Health Law § 281, see also N.Y. Education Law § 6810(8).  Other limited exceptions to the electronic prescription requirement include: (i) temporary technological or electronic failure, (ii) a waiver granted to the prescriber by the New York State Commissioner of Health, (iii) a determination by the prescriber that it would be impractical for patients to receive prescriptions in a timely manner if prescribed electronically and would adversely affect patient health, (iv) the prescription will be dispensed by a pharmacy outside of New York State, or (v) a prescription issued via telephone strictly due to an emergency situation. See N.Y. Public Health Law § 281.

114.    The Defendants, however, submitted the "telephone prescriptions" and pre-printed, "checklist prescriptions" not for legitimate reasons, but because they were engaged in collusive agreements and fraudulent protocols to have prescriptions steered them, so as to claim

reimbursement for the Fraudulent Pharmaceuticals as part of their fraudulent scheme.

**C.    The Fraudulent Topical Diclofenac Gel**

115.    The Defendants solicited NP Houslin, the other Prescribers, and Clinic Controllers to provide them with voluminous prescriptions for Fraudulent Topical Diclofenac because the Defendants could bill for this pharmaceutical product at exorbitant charges, which egregiously inflated the charges submitted to GEICO and other New York No-Fault automobile insurers.

116.    Tree of Life Rx billed GEICO more than $486,000.00 for dispensing, or purportedly dispensing, Fraudulent Topical Diclofenac to numerous Insureds.  In many instances, Tree of Life Rx dispensed Fraudulent Topical Diclofenac that it purchased from an out-of-state secondary wholesaler, for cash, which wholesaler was not registered with the New York State Department of Education.

117.    Fine Care Pharmacy billed more than $671,000.00 for dispensing, or purportedly dispensing, Fraudulent Topical Diclofenac to numerous Insureds. Upon information and belief, Fine Care Pharmacy dispensed Fraudulent Topical Diclofenac that it similarly purchased from an out-of-state secondary wholesaler, for cash, which wholesaler was not registered with the New York State Department of Education.

118.    The FDA requires that diclofenac sodium prescriptions contain a "Black Box Warning" indicating serious cardiovascular and gastrointestinal risks.

119.    A "Black Box Warning" is the strictest warning attached to the labeling of a prescription drug or product by the FDA, and is designed to call attention to serious or life-threatening risks associated with the drug or product.

120.    Specifically, with every diclofenac sodium prescription, the FDA requires the patient be warned that: (i) diclofenac sodium may cause an increased risk of serious

cardiovascular thrombotic events, including myocardial infarction, and stroke, which can be fatal; and (ii) diclofenac sodium may cause an increased risk of serious gastrointestinal adverse events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

121.    Diclofenac sodium gel, when prescribed in 1% concentrations, is a topical NSAID typically used to treat joint pain caused by osteoarthritis in the hands, wrists, elbows, knees, ankles, or feet.  It has not been proven effective for treating strains or sprains.

122.    Diclofenac Gel 3%, i.e., the Diclofenac Gel prescribed by NP Houslin and the other Prescribers, and dispensed by the Pharmacy Provider Defendants, is only FDA approved to treat a skin condition known as actinic keratoses.

123.    Diclofenac Gel 3% has no proven efficacy or safety in the treatment of musculoskeletal injuries, nor is the use of Diclofenac Gel 3% to treat musculoskeletal injuries an accepted off-label use.

124.    In keeping with the fact that the Fraudulent Topical Diclofenac was prescribed and dispensed pursuant to predetermined protocols and without regard for patient care and safety, to the extent the examination reports prepared by NP Houslin and the other Prescribers stated the medical basis for the Fraudulent Topical Diclofenac prescriptions, the explanation was perfunctory and non-individualized.

125.    In further keeping with the fact that the Fraudulent Topical Diclofenac was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, the follow-up examination reports prepared by NP Houslin, the other Prescribers, virtually never addressed whether the Fraudulent Topical Diclofenac prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree,

or whether the patient experienced any side effects.

126.    The fact that that NP Houslin and the other Prescribers failed to properly document the prescriptions for Fraudulent Topical Diclofenac further indicates that there was no legitimate medical reason for the excessive amounts of Fraudulent Topical Diclofenac dispensed by the Defendants, particularly given the potential for adverse health effects to the Insureds.

127.    Pursuant to 8 N.Y.C.R.R. § 63.1(7), pharmacists are required to conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to contraindications, therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

128.    Each year in the United States, approximately 4.5 million ambulatory care visits and 100,000 deaths occur because of adverse drug reactions. A substantial number of these adverse drug reactions are the result of improper prescription practices associated with therapeutic duplication.  See, Mathew Witry, PharmD, PhD, Medication List Discrepancies and Therapeutic Duplications Among Dual Use Veterans, Federal Practitioner, 14 (September 2016).

129.    Therapeutic duplication is the prescribing and dispensing of two or more drugs from the same therapeutic class – such as oral and topical NSAIDs (e.g., Ibuprofen and Fraudulent Topical Diclofenac) – which puts the patient at greater risk of adverse drug reactions without providing any additional therapeutic benefit.

130.    Despite the risks of therapeutic duplication, NP Houslin and the other Prescribers routinely prescribed, and the Defendants routinely dispensed and billed for multiple Fraudulent Pharmaceuticals, from the same therapeutic class, on the same date to a single patient. For example, in many instances, NP Houslin and the other Prescribers prescribed, and the Defendants

dispensed, Fraudulent Topical Diclofenac in conjunction with oral NSAIDs, thereby engaging in therapeutic duplication, while also having simultaneously dispensed other Fraudulent Topical Pain Products such as Fraudulent Topical Lidocaine, which put the Insureds at higher risk for cardiovascular side effects. For example:

- Insured DB was involved in a motor vehicle accident on May 9, 2023, and subsequently sought treatment with NP Houslin of Atlantic Medical. On May 27, 2023, Tree of Life dispensed Fraudulent Topical Diclofenac, Ibuprofen-Famotidine, Fraudulent Topical Lidocaine, and Cyclobenzaprine to DB pursuant to prescriptions issued by NP Houslin on May 24, 2023. On August 14, 2023, Tree of Life dispensed Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Ibuprofen-Famotidine, and Cyclobenzaprine to DB pursuant to prescriptions issued by NP Houslin on August 9, 2023. The simultaneous prescription of Fraudulent Topical Diclofenac and Ibuprofen-Famotidine constitutes therapeutic duplication.

- Insured EG was involved in a motor vehicle accident on June 28, 2023, and subsequently sought treatment with NP Houslin of Atlantic Medical. On July 15, 2023, Tree of Life dispensed Fraudulent Topical Diclofenac, Ibuprofen-Famotidine, Fraudulent Topical Lidocaine, and Cyclobenzaprine to EG pursuant to prescriptions issued by NP Houslin on July 12, 2023. On August 11, 2023, Tree of Life dispensed Fraudulent Topical Diclofenac, Ibuprofen-Famotidine, Fraudulent Topical Lidocaine, and Cyclobenzaprine to EG pursuant to prescriptions issued by NP Houslin on August 9, 2023. The simultaneous prescription of Fraudulent Topical Diclofenac and Ibuprofen-Famotidine constitutes therapeutic duplication.

- Insured GS was involved in a motor vehicle accident on March 26, 2023, and subsequently sought treatment with NP Houslin of Atlantic Medical. On July 21, 2023, Tree of Life dispensed Fraudulent Topical Diclofenac, Ibuprofen-Famotidine, Fraudulent Topical Lidocaine, and Cyclobenzaprine to GS pursuant to prescriptions issued by NP Houslin on July 19, 2023. The simultaneous prescription of Fraudulent Topical Diclofenac and Ibuprofen-Famotidine constitutes therapeutic duplication.

- Insured YSB was involved in a motor vehicle accident on May 17, 2023, and subsequently sought treatment with NP Jagga of Atlantic Medical. On June 5, 2023, Tree of Life dispensed Ibuprofen, Fraudulent Topical Lidocaine, and Cyclobenzaprine to YSB pursuant to prescriptions ordered by NP Jagga on May 26, 2023, and Fraudulent Topical Diclofenac pursuant to a prescription ordered by NP Jagga on May 30, 2023. The simultaneous prescription of Fraudulent Topical Diclofenac and Ibuprofen constitutes therapeutic duplication.

- Insured MHL was involved in a motor vehicle accident on August 4, 2023 and subsequently sought treatment with NP Houslin of Atlantic Medical. On October 23, 2023 and December 6, 2023 Tree of Life dispensed Fraudulent Topical Diclofenac, Ibuprofen, Fraudulent Topical Lidocaine, and Cyclobenzaprine to MHL pursuant to prescriptions issued by NP Houslin on October 18, 2023 and November 29, 2023, respectively. On January 24, 2024, Fine Care Pharmacy dispensed Fraudulent Topical Diclofenac, Ibuprofen, Fraudulent Topical Lidocaine, and Cyclobenzaprine to MHL pursuant to prescriptions issued by NP Houslin on January 17, 2024. The simultaneous prescription of Fraudulent Topical Diclofenac and Ibuprofen constitutes therapeutic duplication.

- Insured SA was involved in a motor vehicle accident on September 6, 2023 and subsequently sought treatment with NP Houslin of Atlantic Medical. On April 6, 2024, Fine Care Pharmacy dispensed Fraudulent Topical Diclofenac, Naproxen, Fraudulent Topical Lidocaine, and Cyclobenzaprine to SA pursuant to prescriptions issued by NP Houslin on April 3, 2024. On October 25, 2023, Tree of Life dispensed Fraudulent Topical Diclofenac and Ibuprofen to SA pursuant to prescriptions issued by NP Houslin on October 23, 2023. The simultaneous prescription of Fraudulent Topical Diclofenac and Naproxen and/or Ibuprofen constitutes therapeutic duplication.

- Insured SD was involved in a motor vehicle accident on August 23, 2023 and subsequently sought treatment with NP Houslin of Atlantic Medical. On January 19, 2024, Fine Care Pharmacy dispensed Diclofenac Potassium, Cyclobenzaprine, Fraudulent Topical Diclofenac, and Fraudulent Topical Lidocaine to SD pursuant to prescriptions issued by NP Houslin on January 10, 2024. The simultaneous prescription of Fraudulent Topical Diclofenac and Diclofenac Potassium constitutes therapeutic duplication.

- Insured GB was involved in a motor vehicle accident on August 5, 2023 and subsequently sought treatment with NP Houslin of Atlantic Medical. On August 25, 2023, Tree of Life dispensed Fraudulent Topical Lidocaine, Ibuprofen-Famotidine, Fraudulent Topical Diclofenac, and Cyclobenzaprine to GB pursuant to prescriptions issued by NP Houslin on August 22, 2023. On February 10, 2024 and April 8, 2024, Fine Care Pharmacy dispensed Fraudulent Topical Diclofenac, Ibuprofen, Fraudulent Topical Lidocaine, and Cyclobenzaprine to GB pursuant to prescriptions issued by NP Houslin on February 7, 2024 and March 18, 2024, respectively. The simultaneous prescription of Fraudulent Topical Diclofenac and Ibuprofen constitutes therapeutic duplication.

- Insured OF was involved in a motor vehicle accident on April 16, 2023 and subsequently sought treatment with NP Houslin of Atlantic Medical. On April 28, 2023, May 22, 2023, July 17, 2023, and August 28, 2023, Tree of Life dispensed Fraudulent Topical Lidocaine, Ibuprofen-Famotidine,

Fraudulent Topical Diclofenac, and Cyclobenzaprine to OF pursuant to prescriptions ordered by NP Houslin on April 19, 2023, May 17, 2023, July 12, 2023, and August 9, 2023, respectively. On November 14, 2023 and December 2, 2023, Tree of Life dispensed Fraudulent Topical Lidocaine, Ibuprofen, Fraudulent Topical Diclofenac, and Cyclobenzaprine to OF pursuant to prescriptions issued by NP Houslin on October 23, 2023 and November 29, 2023. On January 24, 2024 and March 6, 2024, Fine Care Pharmacy dispensed Fraudulent Topical Diclofenac, Ibuprofen, Fraudulent Topical Lidocaine, and Cyclobenzaprine to OF pursuant to prescriptions issued by NP Houslin on January 3, 2024 and February 14, 2024, respectively. The simultaneous prescription of Fraudulent Topical Diclofenac and Ibuprofen and/or Ibuprofen-Famotidine constitutes therapeutic duplication.

131. Prescribing Fraudulent Topical Diclofenac, while simultaneously prescribing or recommending the patient take oral NSAIDS, is therapeutic duplication which results in increased risks with no additional therapeutic benefit.

132. By engaging in therapeutic duplication, NP Houslin, the other Prescribers, and the Defendants put patients at increased risk of cardiovascular and gastrointestinal events (without any additional therapeutic benefits) as the use of oral NSAIDs increases the "Black Box Warning" risks associated with diclofenac sodium.

### D.    The Fraudulent Topical Lidocaine Ointment

133. In addition to the excessive amounts of Fraudulent Topical Diclofenac dispensed by the Pharmacy Defendants, in accordance with the fraudulent scheme discussed above, the Defendants routinely billed GEICO – through Tree of Life Rx and Fine Care Pharmacy – for exorbitantly priced Fraudulent Topical Lidocaine, pursuant to prescriptions solicited from NP Houslin, the other Prescribers, and Clinic Controllers, in exchange for kickbacks or other financial incentives.

134. Tree of Life Rx billed GEICO more than $500,000.00 for dispensing, or purportedly dispensing, Fraudulent Topical Lidocaine to numerous Insureds.

135. Fine Care Pharmacy billed GEICO more than $609,000.00 for dispensing, or

purportedly dispensing, Fraudulent Topical Lidocaine to numerous Insureds.

136.    Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the body. Fraudulent Topical Lidocaine is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison sumac, abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such as sutures or injections.

137.    Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

138.    Excessive dosage or short intervals between doses of Fraudulent Topical Lidocaine can cause serious adverse effects, including, among others, confusion, dizziness, tremors, convulsions, respiratory depression, bradycardia, hypertension, and cardiovascular collapse that may lead to cardiac arrest.  Accordingly, patients should be instructed to strictly adhere to the recommended dosage and a single application of Fraudulent Topical Lidocaine should not exceed 5 grams.

139.    Despite this, NP Houslin and the other Prescribers never recommended Insureds first use OTC Lidocaine products to treat minor aches and pain which they sustained in fender-bender type motor vehicles accidents. Rather, pursuant to collusive arrangements and predetermined protocols, NP Houslin and the other Prescribers, and Clinic Controllers routinely prescribed to Insureds, or caused the prescription of, Fraudulent Topical Lidocaine and directed those prescriptions to the Pharmacy Provider Defendants.

140.    For example, NP Houslin and the other Prescribers never recommended Insureds first try Icy Hot Lidocaine or Aspercreme with Lidocaine, both of which contain 4% lidocaine and are available at most well-known pharmacy retailers at a mere fraction of the cost, including Rite-Aid and Target for advertised prices generally around $10.00 or $20.00.

141.    As with the prescriptions for the Fraudulent Topical Diclofenac, to the extent the initial examination reports prepared by NP Houslin and the other Prescribers set forth a medical basis for the Fraudulent Topical Lidocaine Prescriptions, the explanation was perfunctory and non-individualized.

142.    Likewise, the follow-up examination reports virtually never addressed whether the Fraudulent Topical Lidocaine prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

143.    In fact, pursuant to these fraudulent protocols and collusive arrangements, insureds often received prescriptions for Fraudulent Topical Lidocaine, as well as other Fraudulent Pharmaceuticals, as a matter of first line therapy regardless of their age or individual medical histories, injuries, subjective complaints, or other factors. These prescriptions were routinely issued by Prescribers at the time of the Insureds' initial examinations – within days of the accident – without NP Houslin or the other Prescribers first having recommended oral pain relievers or over-the-counter products.  For example:

- On July 23, 2024, Insured AJ was involved in a motor vehicle accident. Thereafter, on July 24, 2024, only one day after the accident, NP Houslin prescribed AJ Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Ibuprofen, and Cyclobenzaprine, dispensed by Fine Care Pharmacy.

- On April 22, 2024, Insured SN was involved in a motor vehicle accident. Thereafter, on April 24, 2024, only two days after the accident, NP Houslin prescribed SN Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Ibuprofen, and Cyclobenzaprine, dispensed by Fine Care Pharmacy.

- On April 22, 2024, Insured JH was involved in a motor vehicle accident. Thereafter, on April 24, 2024, only two days after the accident, NP Houslin prescribed JH Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Ibuprofen, and Cyclobenzaprine, dispensed by Fine Care Pharmacy.

- On March 3, 2024, Insured SD was involved in a motor vehicle accident. Thereafter, on March 6, 2024, only three days after the accident, NP Houslin

prescribed SD Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Ibuprofen, and Cyclobenzaprine, dispensed by Fine Care Pharmacy.

- On February 2, 2024, Insured NM was involved in a motor vehicle accident. Thereafter, on February 5, 2024, only three days after the accident, NP Houslin prescribed NM Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Ibuprofen, and Cyclobenzaprine, dispensed by Fine Care Pharmacy.

- On July 10, 2023, Insured BB was involved in a motor vehicle accident. Thereafter, on July 12, 2023, only two days after the accident, NP Houslin prescribed BB Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Duexis, and Cyclobenzaprine, dispensed by Tree of Life.

- On August 28, 2023, Insured LC was involved in a motor vehicle accident. Thereafter, on August 30, 2023, only two days after the accident, NP Houslin prescribed LC Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Duexis, and Cyclobenzaprine, dispensed by Tree of Life.

- On November 6, 2023, Insured BJ was involved in a motor vehicle accident. Thereafter, on November 8, 2023, only two days after the accident, NP Houslin prescribed BJ Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Ibuprofen, and Cyclobenzaprine, dispensed by Tree of Life.

- On November 6, 2023, Insured AM was involved in a motor vehicle accident. Thereafter, on November 8, 2023, only two days after the accident, NP Houslin prescribed AM Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Ibuprofen, and Cyclobenzaprine, dispensed by Tree of Life.

- On September 24, 2023, Insured BB was involved in a motor vehicle accident. Thereafter, on September 27, 2023, only three days after the accident, NP Houslin prescribed BB Fraudulent Topical Lidocaine, Fraudulent Topical Diclofenac, Ibuprofen, and Cyclobenzaprine, dispensed by Tree of Life.

144.    Pursuant to their fraudulent scheme, the Defendants' billing to GEICO for Fraudulent Topical Lidocaine has exceeded $1,100,000.00.

145.    The Defendants' egregious billing supported by illegitimate prescriptions, coupled with the fact NP Houslin and the other Prescribers, failed to properly document the prescriptions for the Fraudulent Topical Lidocaine or the Insureds' use of this medication, further indicates that there was no legitimate medical reason for NP Houslin and the other Prescribers to have prescribed large volumes of Fraudulent Topical Lidocaine to the Insureds, or for the

Defendants to have dispensed such large volumes to the Insureds, particularly given the potential for adverse health effects and the availability of comparably effective and less-costly over-the-counter alternatives.

E.    **The Exploiting of Patients for Financial Gain Through the Illegal, Collusive Arrangements Among the Defendants, Prescribers, and Clinic Controllers**

146.    To effectuate the fraudulent scheme, the Defendants steered NP Houslin, the other Prescribers, and the Clinic Controllers to routinely prescribe and direct prescriptions to the Pharmacy Provider Defendants for large volumes of the Fraudulent Pharmaceuticals pursuant to their collusive arrangements, which egregiously inflated the charges submitted to GEICO.

147.    New York's statutory framework provides, among other things, that pharmacies and licensed medical professionals are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

148.    The Defendants colluded with NP Houslin, the other Prescribers, and the Clinic Controllers associated with various No-Fault Clinics, which treat thousands of Insureds, to have NP Houslin and the other Prescribers, prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Lidocaine and Fraudulent Topical Diclofenac, and direct those prescriptions to the Pharmacy Provider Defendants so that they could bill GEICO huge sums.

149.    In furtherance of the scheme, NP Houslin and the other Prescribers, intentionally prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics pursuant to the collusive arrangements and fraudulent predetermined protocols, and

without regard to genuine patient care, cost and attention to fiscal responsibility, or pharmacologic outcomes.

150.    The Prescribers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics, while the Defendants dispensed, or purported to dispense the Fraudulent Pharmaceuticals, despite their knowledge that they were involved in illegal, collusive arrangements designed to exploit the patients for financial gain; the Fraudulent Pharmaceuticals were often prescribed and dispensed without regard to pharmacologic outcomes; the Fraudulent Pharmaceuticals were prescribed and dispensed with gross indifference to patient health, care and safety; the Fraudulent Pharmaceuticals were prescribed and dispensed as a matter of course without any recommendation that patients first try over-the-counter products; and the Fraudulent Pharmaceuticals were prescribed and dispensed without any attention to cost and fiscal responsibility, given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost.

151.    The Defendants, in collusion with NP Houslin, the other Prescribers, and Clinic Controllers, made sure the Insureds never had the option to use a pharmacy of their choosing, and instead ensured the prescriptions for the Fraudulent Pharmaceuticals were directed to the Pharmacy Provider Defendants notwithstanding the fact (i) in many instances the No-Fault Clinics and the patients themselves were located in counties far from the Pharmacy Provider Defendants, and (ii) there were countless other pharmacies located much closer to the No-Fault Clinics and the patients.

152.    At times, the Pharmacy Provider Defendants purported to mail or deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes, without the patient ever seeing the actual written prescription and, in some cases, without the patient even knowing that they were

to receive a Fraudulent Pharmaceutical.

153.    Alternatively, Insureds were given the Fraudulent Pharmaceuticals dispensed by the Pharmacy Provider Defendants by the front desk staff at the various No-Fault Clinics, again without ever seeing the actual prescription or, in some cases, not even knowing that they were to receive a Fraudulent Pharmaceutical.

154.    The Defendants, NP Houslin, the other Prescribers, and Clinic Controllers did not give the Insureds the option to identify a pharmacy of their choosing to ensure that the prescriptions were filled by the Pharmacy Provider Defendants, and to ensure that the Defendants benefitted financially from the prescriptions.

155.    NP Houslin and the other Prescribers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

156.    NP Houslin, the other Prescribers, and the Clinic Controllers had no legitimate reason to direct the prescriptions for the Fraudulent Pharmaceuticals to the Pharmacy Provider Defendants rather than to a multitude of other pharmacies that were equally capable of dispensing the prescriptions and often more convenient to many of the patients.

157.    The Defendants, NP Houslin, the other Prescribers, and Clinic Controllers would not have engaged in the illegal, collusive arrangements in violation of New York law, including intentionally prescribing the Fraudulent Pharmaceuticals, and directing those prescriptions to the Pharmacy Provider Defendants, unless they profited from their participation in the illegal scheme.

158.    But for the payments of kickbacks or other financial incentives from the Defendants, NP Houslin and the other Prescribers, would not have prescribed the Fraudulent Topical Lidocaine and Fraudulent Topical Diclofenac, and NP Houslin and the other Prescribers,

and Clinic Controllers would not have directed the prescriptions to the Pharmacy Provider Defendants.

159.    The Defendants, NP Houslin, the other Prescribers, and Clinic Controllers affirmatively concealed the particular amounts paid for the kickbacks since such kickbacks are in violation of New York law.

160.    Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, the Defendants paid a financial kickback or provided other financial incentives, and NP Houslin, the other Prescribers, and the Clinic Controllers received a financial kickback or other financial incentives, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that were dispensed by the Pharmacy Provider Defendants.

161.    Upon information and belief, the payment of kickbacks by the Defendants was made at or near the time the prescriptions were issued.

## V.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

162.    Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged.  Each NDC number has an assigned Average Wholesale Price ("AWP").

163.    Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained.  The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

164.    Notably, despite purporting to be separate entities, the Pharmacy Provider Defendants submitted certain claims for reimbursement for the Fraudulent Topical Diclofenac

under the same NDC numbers (62332058131, 68462035594, and 51672136307) typically resulting in a charge of $1,886.40 or $1,888.00 per prescription. In the event the Pharmacy Provider Defendants legitimately purchased the Fraudulent Topical Diclofenac, this would mean each of the Pharmacy Provider Defendant purchased the Fraudulent Topical Diclofenac from the suppliers in the same exact quantities.

165.    Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

166.    For each generic drug (or ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

167.    The Defendants solicited the Clinic Controllers, NP Houslin, and the other Prescribers, to provide them with voluminous prescriptions for the Fraudulent Topical Pain Products because the Defendants could readily buy the Fraudulent Topical Pain Products at low cost but bill GEICO and other New York No-Fault insurers inflated amounts based on egregiously high wholesale prices.

168.    The Defendants intentionally targeted the Fraudulent Topical Pain Products, with extremely expensive "average wholesale prices," in order to inflate the billing submitted by the Pharmacy Provider Defendants and to maximize their profits.

169.    Moreover, each of the Pharmacy Provider Defendants submitted many of the same documents in support of their charges to GEICO, including: (i) a fax transmission coversheet; (ii) printed records of Prescribers' purported prescriptions; (iii) an NF-3 Form which

included the purported NDC numbers, units, and corresponding charges for each drug product or ingredient; (iv) a delivery receipt purportedly executed by the Insured; and, at times (v) an assignment of benefits form purportedly executed by the Insured.

170.    The NDC numbers listed on the NF-3 Forms submitted by the Defendants are what identified the purported AWPs for each of the Fraudulent Pharmaceuticals.

171.    The Defendants never actually paid the targeted and egregious "average wholesale price" of the Fraudulent Topical Pain Products that they dispensed, or purported to dispense, because it is not a true representation of actual market price and is far above the actual acquisition cost for Fraudulent Topical Pain Products.

172.    The Defendants paid only a fraction of the "average wholesale price" of the Fraudulent Topical Pain Products that the Defendants targeted to use in connection with the Pharmacy Provider Defendants' billing, but nevertheless billed GEICO and other No-Fault insurers egregious amounts far surpassing the cost of an array of other FDA-approved, proven effective medications or commercially available over-the-counter products.

## VI.    The Defendants' Submission to GEICO of Fraudulent NF-3 Forms

173.    To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits have consistently been submitted to GEICO by and on behalf of the Pharmacy Provider Defendants seeking payment for pharmaceuticals for which they are ineligible to receive.

174.    These forms, including NF-3 Forms and other supporting records that the Defendants submitted or cause to be submitted to GEICO, were false and misleading in the following material respects:

   i.    The NF-3 Forms and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care. In fact, the Fraudulent Pharmaceuticals were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain without regard for genuine patient care;

ii.     The NF-3 Forms and other supporting records uniformly misrepresented to GEICO that the Defendants submitted valid charges for medically necessary pharmaceutical products intended for genuine patient care. In fact, the Defendants intentionally inflated the bills to GEICO by targeting a specific set of pharmaceutical products they could acquire at low cost and dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals.

iii.    The NF-3 Forms and other supporting records uniformly misrepresented to GEICO that the Defendants complied with all material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that they dispensed and billed for Fraudulent Pharmaceuticals pursuant to illegal, invalid, and duplicitous prescriptions; and

iv.    The NF-3 Forms and other supporting records uniformly misrepresented to GEICO that the Defendants complied with all material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants engaged in illegal, collusive relationships with NP Houslin, the other Prescribers, and Clinic Controllers in order to steer voluminous and illegal prescriptions to the Pharmacy Provider Defendants for the Fraudulent Pharmaceuticals, in exchange for the payment of kickbacks and other financial incentives.

175.   As a direct result of Defendants' integrated scheme, and in reliance on the fraudulent billing submissions made through the Pharmacy Provider Defendants, GEICO voluntarily issued payments to Defendants in response to the bills submitted, which payments total approximately $177,000.00, including payments to Tree of Life totaling approximately $49,400.00, and payments to Fine Care Pharmacy totaling approximately $127,800.00.

## VII.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

176.   The Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to the Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for these products.

177.   To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Defendants have gone to great lengths to systematically conceal their fraud.

178.    Specifically, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; and (ii) the Defendants were involved in collusive kickback arrangements with NP Houslin, the other Prescribers, and Clinic Controllers designed to generate voluminous prescriptions solely to maximize the billing submitted to GEICO and other New York insurance companies.

179.    The Defendants also billed for the Fraudulent Pharmaceuticals based on purported prescriptions from multiple Prescribers operating from multiple No-Fault Clinics in order to reduce the amount of billing based on any single licensee.

180.    The Defendants also caused billing to be submitted through multiple Pharmacy Provider Defendants on a single claim in order to reduce the amount of billing submitted through any one of them.

181.    The Defendants also caused billing to be submitted by each of the Pharmacy Provider Defendants for only a short period of time in order to collect as much reimbursement as possible on their fraudulent claims, as quickly as possible, to prevent discovery of the wide-ranging scheme.

182.    The billing and supporting documentation submitted by the Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, did not reveal its fraudulent nature.

183.    Because the billing and supporting documentation submitted by Defendants did not reveal its fraudulent nature, GEICO voluntarily issued payments in response to Defendants' billing submissions in accordance with the No-Fault Laws.

184.    GEICO is under statutory and contractual obligations to promptly and fairly

process claims within 30 days. The facially-valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of approximately $177,000.00 representing payments made by GEICO based upon the fraudulent charges submitted by the Defendants, which damages are to be trebled under 18 U.S.C. § 1962(c)), et al. to $531,000.00.

185.    The Defendants also have hired a single law firm – Gary Tsirelman P.C. – to pursue collection from GEICO of additional fraudulent charges in response to the Pharmacy Provider Defendants' billing submissions. This law firm routinely files expensive and time-consuming collection proceedings, in piece-meal fashion, against GEICO and other insurers if the charges are not promptly paid in full, all as part of the scheme and to monetize the Defendants' fraudulent activity as quickly as possible. In fact, the Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that the Pharmacy Provider Defendants have been engaged in fraud.

186.    The Defendants are currently pursuing collection of approximately $1.2 million from GEICO through approximately 151 individual state collection lawsuits pending in the New York City civil courts.

187.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed its original Complaint.

### THE FIRST CLAIM FOR RELIEF
**Against Defendants Tree of Life Rx, Aronov, Fine Care Pharmacy, and Ballas**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

188.    GEICO incorporates, as though fully set forth herein, each and every allegation

in the paragraphs set forth above.

189.    There is an actual case in controversy between GEICO and the Defendants regarding approximately $2,170,000.00 in fraudulent pending billing for Fraudulent Pharmaceuticals that Defendants submitted or caused to be submitted to GEICO through Tree of Life and Fine Care Pharmacy.

190.    Specifically, there is an actual case in controversy between GEICO and Defendants regarding:

    (i)    approximately $1,136,000.00 in fraudulent pending billing Defendants submitted or caused to be submitted under the "name" of Fine Care Pharmacy; and

    (ii)    approximately $1,033,000.00 in fraudulent pending billing Defendants submitted or caused to be submitted under the "name" of Tree of Life.

191.    Tree of Life Rx and Fine Care Pharmacy (i.e., the Pharmacy Provider Defendants) have no right to receive payment for any pending bills submitted to GEICO because Tree of Life Rx and Fine Care Pharmacy billed for pharmaceutical products that were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed solely for financial gain, without regard for genuine patient care.

192.    Tree of Life Rx and Fine Care Pharmacy have no right to receive payment for any pending bills submitted to GEICO because the Defendants intentionally inflated the charges to GEICO by targeting specific pharmaceutical products (i.e., the Fraudulent Topical Lidocaine and Fraudulent Topical Diclofenac) that they acquired at low cost and caused Tree of Life Rx and Fine Care Pharmacy to dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain and without regard for genuine patient care in violation of law.

193.    Tree of Life Rx and Fine Care Pharmacy have no right to receive payment for

any pending bills submitted to GEICO because the Defendants participated in illegal, collusive relationships in which the Defendants steered NP Houslin, the other Prescribers, and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Tree of Life Rx and Fine Care Pharmacy in exchange for unlawful kickbacks and other financial incentives.

194.    Tree of Life Rx and Fine Care Pharmacy have no right to receive payment for any pending bills submitted to GEICO because the Defendants made and continue to make false and fraudulent misrepresentations to GEICO in that they submitted fraudulent claims to GEICO for the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and duplicitous and continue to seek collection on their unpaid claims.

195.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Fine Care and Tree of Life have no right to receive payment for any pending bills submitted to GEICO.

<u>THE SECOND CLAIM FOR RELIEF</u>
**Against Defendants Tree of Life Rx, Aronov and the John Doe Defendants**
**(Common Law Fraud)**

196.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

197.    Tree of Life Rx, Aronov, and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of Tree of Life Rx.

198.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)    in every claim, the representation that the billed-for services were medically necessary and properly billed when in fact the billed-for services were not medically necessary and/or were the product of predetermined fraudulent

protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

(ii)    in every claim, the representation Tree of Life Rx acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants inflated the charges by intentionally targeting specific pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds with inflated charges, in place of other effective, less costly pharmaceuticals solely for financial gain and without regard for genuine patient care in violation of law;

(iii)    in every claim, the representation Tree of Life Rx acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which the Defendants steered NP Houslin, the other Prescribers, and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Tree of Life Rx in exchange for unlawful kickbacks and other financial incentives; and

(iv)    n every claim, the representation Tree of Life Rx acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for services were the product of illegal, invalid, and duplicitous prescriptions.

199.    Tree of Life Rx, Aronov, and the John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Tree of Life Rx that were not compensable under the No-Fault Laws.

200.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $49,400.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by the Defendants through Tree of Life Rx. The fraudulent bills and corresponding mailings/wires submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

201.    Tree of Life Rx's, Aronov's, and the John Doe Defendants' extensive fraudulent

conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

202.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THE THIRD CLAIM FOR RELIEF
### Against Defendants Tree of Life Rx, Aronov, and the John Doe Defendants
### (Unjust Enrichment)

203.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

204.    As set forth above, Tree of Life Rx, Aronov, and the John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

205.    When GEICO paid the bills and charges submitted by or on behalf of Tree of Life Rx for No-Fault Benefits, it reasonably believed it was legally obligated to make such payments based on Tree of Life Rx's, Aronov's, and the John Doe Defendants' improper, unlawful, and/or unjust acts.

206.    Tree of Life Rx, Aronov, and the John Doe Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit Tree of Life Rx, Aronov, and the John Doe Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

207.    Tree of Life Rx's, Aronov's, and the John Doe Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

208.    By reason of the above, Tree of Life Rx, Aronov, and the John Doe Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount

of $49,400.00.

### THE FOURTH CLAIM FOR RELIEF
**Against Aronov and the John Doe Defendants**
**(Violation of 18 U.S.C. § 1962(c))**

209.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

210.    Tree of Life Rx is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

211.    Aronov and the John Doe Defendants knowingly conducted and/or participated, directly or indirectly, in the conduct of Tree of Life Rx's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341 and/or federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the United States mails and/or interstate wires to submit or cause to be submitted thousands of fraudulent charges on a continuous basis – and to continue efforts to collect on those charges through the present – seeking payments Tree of Life Rx was not eligible to receive under the No-Fault Laws because: (i) the Fraudulent Pharmaceuticals were not medically necessary but rather prescribed and dispensed pursuant to predetermined protocols designed to exploit the patients for financial gain; (ii); the Defendants intentionally inflated the charges by targeting specific pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and dispensed in large volumes to Insureds at inflated charges; (iii) the Fraudulent Pharmaceuticals were the product of illegal, collusive arrangements intended to inflate the billing submitted through Tree of Life Rx to insurers and to financially enrich the Defendants; and (iv) the billed-for services were the product of illegal, invalid, and duplicitous prescriptions. The fraudulent bills and corresponding mailings/wires submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed

hereto as Exhibit "1."

212.    Tree of Life Rx's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail and wire fraud are the regular way in which Aronov and the John Doe Defendants operated Tree of Life Rx, inasmuch as Tree of Life Rx never was eligible to bill for or collect No-Fault Benefits, and acts of mail and wire fraud therefore were essential in order for Tree of Life Rx to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail and wire fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Tree of Life Rx to the present day.

213.    Tree of Life Rx is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants. These inherently unlawful acts are taken by Tree of Life Rx in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

214.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $49,400.00 pursuant to the fraudulent bills submitted by the Defendants through Tree of Life Rx.

215.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THE FIFTH CLAIM FOR RELIEF
### Against Aronov and the John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

216.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

217.    Tree of Life Rx is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

218.    Aronov and the John Doe Defendants are employed by and/or associated with the Tree of Life Rx enterprise.

219.    Aronov and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Tree of Life Rx's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341 and federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the United States mail and/or interstate wires to submit or cause to be submitted thousands of fraudulent charges on a continuous basis – and to continue efforts to collect on those charges through the present – seeking payments that Tree of Life Rx was not eligible to receive under the No-Fault Laws because: (i) the Fraudulent Pharmaceuticals were not medically necessary but rather prescribed and dispensed pursuant to predetermined protocols designed to exploit the patients for financial gain; (ii) the Defendants inflated the charges by intentionally targeting specific pharmaceutical products (i.e., the Fraudulent Topical Lidocaine and Fraudulent Topical Diclofenac) that they acquired at low cost and dispensed in large volumes to Insureds at inflated charges; (iii) the Fraudulent Pharmaceuticals were the product of illegal, collusive arrangements intended to inflate the billing submitted through Tree of Life Rx to insurers and to financially enrich the Defendants; and (iv) the billed-for services were the product of illegal, invalid, and duplicitous prescriptions. The fraudulent bills and corresponding

mailings/wires submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

220.    Aronov and the John Doe Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO and by continuing to seek collection of those fraudulent charges.

221.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $49,400.00 pursuant to the fraudulent bills submitted by the Defendants through Tree of Life Rx.

222.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THE SIXTH CLAIM FOR RELEIF
### Against NP Houslin and John Doe Defendants Nos. "1" through "10"
### (Aiding and Abetting Fraud)

223.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

224.    NP Houslin and John Doe Defendants "1" through "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Aronov and Tree of Life.

225.    The acts of NP Houslin in furtherance of the fraudulent scheme include knowingly purporting to prescribe the Fraudulent Pharmaceuticals in predetermined, protocol fashion, participating in illegal, collusive relationships with Aronov and Tree of Life to prescribe and direct illegal, predetermined prescriptions for the Fraudulent Pharmaceuticals to Tree of Life, and

permitting her name to be used in the billing, prescription records and treatment reports submitted in support of the Fraudulent Pharmaceuticals that were used solely to maximize profits without regard for genuine patient care.

226.    The conduct of NP Houslin in furtherance of the fraudulent scheme was significant and material, with approximately 66% of the more than $1.15 million in fraudulent billing submitted to GEICO by Tree of Life attributable to prescriptions issued by NP Houslin.  Further, NP Houslin's conduct was necessary and critical to the success of the fraudulent scheme because without her actions, there would be no opportunity for Tree of Life submit billing for the Fraudulent Pharmaceuticals and to obtain the large payments from GEICO and other insurers.

227.    The acts of John Doe Defendants "1" through "10" in furtherance of the fraudulent scheme include knowingly participating in the implementation and facilitation of the predetermined protocols and the illegal, collusive agreements with NP Houslin and the other Prescribers, wherein they prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals in exchange for kickbacks and other financial incentives from Aronov and Tree of Life.  The conduct of John Doe Defendants "1" through '10" in furtherance of the fraudulent scheme was significant and material.

228.    NP Houslin and John Doe Defendants "1" through "10" undertook the above wrongful acts and conduct knowing that Aronov and Tree of Life were engaged in a scheme to defraud GEICO and other New York automobile insurance companies that involved (i) engaging in unlawful kickback arrangements to generate large volumes of predetermined prescriptions for the Fraudulent Pharmaceuticals that could be directed to Tree of Life; (iii) prescribing and dispensing Fraudulent Pharmaceuticals that were not medically necessary and were prescribed and dispensed without regard for genuine patient care; (iii) submitting billing from Tree of Life to

GEICO and other New York automobile insurance companies that was inflated as a result of her issuance of pre-determined, protocol prescriptions for expensive Fraudulent Pharmaceuticals that were designed solely to maximize profits; and (v) intentionally targeting a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that Aronov and Tree of Life could bill for at exorbitant prices despite the availability of over-the-counter and other effective, less costly pharmaceuticals that could have been prescribed and dispensed to the patients.

229.    NP Houslin and John Doe Defendants "1" through "10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Tree of Life for medically unnecessary and illusory Fraudulent Pharmaceuticals that were not compensable under the No-Fault Laws.

230.    The conduct of NP Houslin and John Doe Defendants "1" through "10" caused GEICO to pay approximately $49,400.00 pursuant to the fraudulent bills that the Defendants submitted or caused to be submitted through Tree of Life.

231.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages

232.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory damages from NP Houslin and John Doe Defendants "1" through "10" in an amount to be determined at trial, but in the approximate amount of $49,400.00, along with punitive damages, interest and costs, and any other relief the Court deems just and proper.

### THE SEVENTH CLAIM FOR RELIEF
**Against Defendants Fine Care Pharmacy, Ballas, and the John Doe Defendants**
**(Common Law Fraud)**

233.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

234.    Fine Care Pharmacy, Ballas, and the John Doe Defendants intentionally and

knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name Fine Care Pharmacy.

235.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)     in every claim, the representation that the billed-for services were medically necessary and properly billed when in fact the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

(ii)    in every claim, the representation Fine Care Pharmacy validly billed for medically necessary services when in fact the Defendants inflated the charges by intentionally targeting specific pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds with inflated charges, in place of other effective, less costly pharmaceuticals solely for financial gain and without regard for genuine patient care in violation of law;

(iii)   in every claim, the representation Fine Care Pharmacy acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which the Defendants steered NP Houslin, the other Prescribers, and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Fine Care Pharmacy in exchange for unlawful kickbacks and other financial incentives; and

(iv)    in every claim, the representation Fine Care Pharmacy acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for services were the product of illegal, invalid, and duplicitous, prescriptions.

236.    Fine Care Pharmacy, Ballas, and the John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Fine Care Pharmacy that were not compensable under the No-Fault Laws.

237.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $127,800.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by the Defendants through Fine Care Pharmacy. The fraudulent bills and corresponding mailings/wires submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2."

238.     Fine Care Pharmacy's, Ballas', and the John Doe Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

239.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THE EIGHTH CLAIM FOR RELIEF
**Against Defendants Fine Care Pharmacy, Ballas, and the John Doe Defendants
(Unjust Enrichment)**

240.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

241.     As set forth above, Fine Care Pharmacy, Ballas, and the John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

242.     When GEICO paid the bills and charges submitted by or on behalf of Fine Care Pharmacy for No-Fault Benefits, it reasonably believed it was legally obligated to make such payments based on Fine Care Pharmacy's, Ballas', and the John Doe Defendants' improper, unlawful, and/or unjust acts.

243.     Fine Care Pharmacy, Ballas, and the John Doe Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit Fine Care Pharmacy, Ballas, and the John Doe Defendants voluntarily accepted and profited from, as a result of,

among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

244.    Fine Care Pharmacy's, Ballas', and the John Doe Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

245.    By reason of the above, Fine Care Pharmacy, Ballas, and the John Doe Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $127,800.00.

**THE NINTH CLAIM FOR RELIEF**
**Against Ballas and the John Doe Defendants**
**(Violation of 18 U.S.C. § 1962(c))**

246.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

247.    Fine Care Pharmacy is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

248.    Ballas and the John Doe Defendants knowingly conducted and/or participated, directly or indirectly, in the conduct of Fine Care Pharmacy's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341 and federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the United States mails and/or interstate wires to submit or cause to be submitted thousands of fraudulent charges on a continuous basis – and to continue efforts to collect on those charges through the present – seeking payments that Fine Care Pharmacy was not eligible to receive under the No-Fault Laws because: (i) the Fraudulent Pharmaceuticals were not medically necessary but rather prescribed and dispensed pursuant to predetermined protocols designed to exploit the patients for financial gain; (ii) the Defendants inflated the charges by intentionally targeting specific pharmaceutical products (i.e., the Fraudulent Topical Lidocaine and Fraudulent Topical Diclofenac) that they

acquired at low cost and dispensed in large volumes to Insureds at inflated charges; (iii) the Fraudulent Pharmaceuticals were the product of illegal, collusive arrangements intended to inflate the billing submitted through Fine Care Pharmacy to insurers and to financially enrich the Defendants; and (iv) the billed-for services were the product of illegal, invalid, and duplicitous prescriptions. The fraudulent bills and corresponding mailings/wires submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2."

249.    Fine Care Pharmacy's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail and wire fraud are the regular way in which Ballas and the John Doe Defendants operated Fine Care Pharmacy, inasmuch as Fine Care Pharmacy never was eligible to bill for or collect No-Fault Benefits, and acts of mail and wire fraud therefore were essential in order for Fine Care Pharmacy to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail and wire fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Fine Care Pharmacy to the present day.

250.    Fine Care Pharmacy is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants. These inherently unlawful acts are taken by Fine Care Pharmacy in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

251.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $127,800.00 pursuant to the fraudulent bills submitted by the Defendants through Fine Care Pharmacy.

252.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THE TENTH CLAIM FOR RELIEF
### Against Ballas and the John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d)).

253.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

254.    Fine Care Pharmacy is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

255.    Ballas and the John Doe Defendants are employed by and/or associated with the Fine Care Pharmacy enterprise.

256.    Ballas and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Fine Care Pharmacy's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341 and federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the United States mail and/or interstate wires to submit or cause to be submitted thousands of fraudulent charges on a continuous basis – and to continue efforts to collect on those charges through the present – seeking payments that Fine Care Pharmacy was not eligible to receive under the No-Fault Laws because: (i) the Fraudulent Pharmaceuticals were not medically necessary but rather prescribed and dispensed pursuant to predetermined protocols designed to exploit the patients for financial gain; (ii) the Defendants inflated the charges by

73

intentionally targeting specific pharmaceutical products (i.e., the Fraudulent Topical Lidocaine and Fraudulent Topical Diclofenac) that they acquired at low cost and dispensed in large volumes to Insureds at inflated charges; (iii) the Fraudulent Pharmaceuticals were the product of illegal, collusive arrangements intended to inflate the billing submitted through Fine Care Pharmacy to insurers and to financially enrich the Defendants; and (iv) the billed-for services were the product of illegal, invalid, and duplicitous prescriptions. The fraudulent bills and corresponding mailings/wires submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2."

257.    Ballas and the John Doe Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO and by continuing to seek collection of those fraudulent charges.

258.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $127,800.00 pursuant to the fraudulent bills submitted by the Defendants through Fine Care Pharmacy.

259.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THE ELEVENTH CLAIM FOR RELIEF**
**Against NP Houslin and John Doe Defendants Nos. "1" through "10"**
**(Aiding and Abetting Fraud)**

260.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

261.    NP Houslin and John Doe Defendants "1" through "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Ballas and Fine Care Pharmacy.

262.    The acts of NP Houslin in furtherance of the fraudulent scheme include knowingly purporting to prescribe the Fraudulent Pharmaceuticals in predetermined, protocol fashion, participating in illegal, collusive relationships with Ballas and Fine Care Pharmacy to prescribe and direct illegal, predetermined prescriptions for the Fraudulent Pharmaceuticals to Fine Care Pharmacy, and permitting her name to be used in the billing, prescription records and treatment reports submitted in support of the Fraudulent Pharmaceuticals that were used solely to maximize profits without regard for genuine patient care.

263.    The conduct of NP Houslin in furtherance of the fraudulent scheme was significant and material, with approximately 97% of the more than $1 million in fraudulent billing submitted to GEICO by Fine Care Pharmacy attributable to prescriptions issued by NP Houslin.  Further, NP Houslin's conduct was necessary and critical to the success of the fraudulent scheme because without her actions, there would be no opportunity for Fine Care Pharmacy submit billing for the Fraudulent Pharmaceuticals and to obtain the large payments from GEICO and other insurers.

264.    The acts of John Doe Defendants "1" through "10" in furtherance of the fraudulent scheme include knowingly participating in the implementation and facilitation of the predetermined protocols and the illegal, collusive agreements with NP Houslin and the other Prescribing Providers, wherein they prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals in exchange for kickbacks and other financial incentives from Ballas and Fine Care Pharmacy.  The conduct of John Doe Defendants "1" through '10" in furtherance of the fraudulent scheme was significant and material.

265.    NP Houslin and John Doe Defendants "1" through "10" undertook the above

wrongful acts and conduct knowing that Ballas and Fine Care Pharmacy were engaged in a scheme to defraud GEICO and other New York automobile insurance companies that involved (i) engaging in unlawful kickback arrangements to generate large volumes of predetermined prescriptions for the Fraudulent Pharmaceuticals that could be directed to Fine Care Pharmacy; (iii) prescribing and dispensing Fraudulent Pharmaceuticals that were not medically necessary and were prescribed and dispensed without regard for genuine patient care; (iii) submitting billing from Fine Care Pharmacy to GEICO and other New York automobile insurance companies that was inflated as a result of her issuance of pre-determined, protocol prescriptions for expensive Fraudulent Pharmaceuticals that were designed solely to maximize profits; and (v) intentionally targeting a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that Ballas and Fine Care Pharmacy could bill for at exorbitant prices despite the availability of over-the-counter and other effective, less costly pharmaceuticals that could have been prescribed and dispensed to the patients.

266.    NP Houslin and John Doe Defendants "1" through "10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Fine Care Pharmacy for medically unnecessary and illusory Fraudulent Pharmaceuticals that were not compensable under the No-Fault Laws.

267.    The conduct of NP Houslin and John Doe Defendants "1" through "10" caused GEICO to pay approximately $127,800.00 pursuant to the fraudulent bills that the Defendants submitted or caused to be submitted through Fine Care Pharmacy.

268.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages

269.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory damages from NP Houslin and John Doe Defendants "1" through "10" in an amount to be

determined at trial, but in the approximate amount of $127,800.00, along with punitive damages, interest and costs, and any other relief the Court deems just and proper.

## THE TWELFTH CLAIM FOR RELIEF
### Against Ballas and Aronov and the John Doe Defendants
### (Violation of 18 U.S.C. § 1962(c))

270.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

271.    Tree of Life Rx and Fine Care Pharmacy constitute an association-in-fact "enterprise" (the "Pharmacy Enterprise"), as defined in 18 U.S.C. § 1961(4), which engages in activities that affect interstate commerce.

272.    The members of the Pharmacy Enterprise are and have been associated through time, joined in purpose, and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Tree of Life Rx and Fine Care Pharmacy ostensibly are independent entities with different names and tax identification numbers that were created and/or operated as vehicles to achieve a common purpose – to facilitate the submission of fraudulent charges to GEICO and other insurers. The Pharmacy Enterprise operated under two separate corporate names in order to reduce the number of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one company. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Pharmacy Enterprise acting individually or without the aid of each other.

273.    The Pharmacy Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by employing and coordinating many

professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud and wire fraud (i.e., the submission of the fraudulent bills to GEICO); by creating and maintaining patient files and other records; by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of insurance payments; by selecting and purchasing the targeted Fraudulent Pharmaceuticals from wholesalers; by coordinating the fraudulent scheme with various Prescribers and Clinic Controllers operating at No-Fault Clinics including obtaining prescriptions from them and delivering the Fraudulent Pharmaceuticals to them to dispense to Insureds; by facilitating payments stemming from the illegal kickback arrangements; and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

274.    Ballas, Aronov, and the John Doe Defendants were employed by and/or associated with the Pharmacy Enterprise and knowingly conducted and/or participated, directly or indirectly, in the conduct of the Pharmacy Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341 and federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the United States mails and/or interstate wires to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years, along with continued efforts to collect on those charges, seeking payments Tree of Life Rx and Fine Care Pharmacy were not eligible to receive under the No-Fault Laws. Specifically, the acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341:

(i)    Ballas, Aronov, and the John Doe Defendants devised, executed, and/or knowingly assisted in carrying out a scheme to defraud GEICO of their money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts

regarding the healthcare claims for payment;

(ii)   Pursuant to the scheme, Ballas, Aronov, and the John Doe Defendants submitted, or caused to be submitted, to GEICO, through the Pharmacy Enterprise, false and fraudulent claims and information in which they concealed that the charges submitted were for services provided pursuant to illegal, collusive agreements, kickbacks, fraudulent and counterfeit prescriptions, and for financial incentive rather than genuine patient care; and

(iii)   Pursuant to the scheme, Ballas, Aronov, and the John Doe Defendants submitted, or caused to be submitted, to GEICO, through the Pharmacy Enterprise, false and fraudulent claims and information in which they falsely represented that the Fraudulent Pharmaceuticals the Pharmacy Enterprise billed for were medically necessary when in fact they were not medically necessary and were instead dispensed and billed pursuant to predetermined treatment protocols solely to maximize profits.

275.   For the purpose of executing this scheme and artifice to defraud, Ballas and Aronov, and the John Doe Defendants submitted, or caused to be submitted, false and fraudulent claims and information to GEICO by use of the mail and/or interstate wire that caused GEICO to make payments for said fraudulent claims. A representative sample of the fraudulent bills and corresponding mailings/wires submitted to GEICO through the Pharmacy Enterprise that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibits "1" – "2".

276.   The Pharmacy Enterprise's business is racketeering activity, inasmuch as it exists for the purpose of submitting fraudulent charges to insurers and seeking to collect on the submitted fraudulent charges. The predicate acts of mail and wire fraud are the regular way in which Ballas, Aronov, and the John Doe Defendants operated the Pharmacy Enterprise and acts of mail and wire fraud therefore are essential for the Pharmacy Enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail and wire fraud, changing of TIN numbers and entities, implies a threat of continued criminal activity, as does the fact that Ballas and Aronov, and the John Doe Defendants continue to

attempt collection on the fraudulent billing submitted through the Pharmacy Enterprise to the present day.

277.    The Pharmacy Enterprise is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO (and likely other automobile insurers). These inherently unlawful acts are taken by the Pharmacy Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO (and likely other automobile insurers) through fraudulent no-fault billing.

278.    GEICO has been injured in their business and property by reason of the above-described conduct in that they have paid approximately $177,000.00 pursuant to the fraudulent bills submitted in furtherance of the Pharmacy Enterprise.

279.    By reason of their injuries, Plaintiffs are entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THE THIRTEENTH CLAIM FOR RELIEF
**Against Ballas, Aronov and the John Doe Defendants**
**(Violation of 18 U.S.C. § 1962(d))**

280.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

281.    Tree of Life Rx and Fine Care Pharmacy constitute an association-in-fact "enterprise" (the "Pharmacy Enterprise"), as defined in 18 U.S.C. § 1961(4), which engages in activities that affect interstate commerce.

282.    Ballas, Aronov, and the John Doe Defendants were employed by and/or associated with the Pharmacy Enterprise and knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Pharmacy Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal

mail fraud statute, 18 U.S.C. § 1341 and federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the United States mails and/or interstate wires to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years, along with continued efforts to collect on those charges, seeking payments that Tree of Life Rx and Fine Care Pharmacy were not eligible to receive under the No-Fault Laws. Specifically, the acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341:

(i)     Ballas, Aronov, and the John Doe Defendants agreed, combined and conspired to devise, execute, and/or knowingly assist in carrying out a scheme to defraud GEICO of their money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the healthcare claims for payment;

(ii)    Pursuant to the scheme, Ballas and Aronov, and the John Doe Defendants agreed, combined and conspired to submit, or caused to be submitted, to GEICO, through the Pharmacy Enterprise, false and fraudulent claims and information in which Ballas and Aronov, and the John Doe Defendants agreed, combined and conspired to conceal that the charges submitted were for services provided pursuant to illegal, collusive agreements, kickbacks, illegal, invalid, and duplicitous, prescriptions, and for financial incentive rather than genuine patient care; and

(iii)   Pursuant to the scheme, Ballas and Aronov, and the John Doe Defendants agreed, combined and conspired to submit, or caused to be submitted, to GEICO, through the Pharmacy Enterprise false and fraudulent claims and information in which Ballas and Aronov, and the John Doe Defendants agreed, combined and conspired to falsely represent that the Fraudulent Pharmaceuticals the Pharmacy Enterprise billed for were medically necessary when in fact they were not medically necessary and were instead dispensed and billed pursuant to predetermined treatment protocols solely to maximize profits.

283.    Ballas, Aronov, and the John Doe Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

284.    GEICO has been injured in its business and property by reason of the above-

described conduct in that it has paid approximately $177,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Pharmacy Enterprise.

285.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.    On the First Claim For Relief against Tree of Life Rx, Aronov, Fine Care Pharmacy, and Ballas, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Fine Care Pharmacy and Tree of Life Rx have no right to receive payment for any pending bills, amounting to approximately $2,170,000.00 in charges submitted to GEICO;

B.    On the Second Claim For Relief against Tree of Life Rx, Aronov, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $49,400.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C.    On the Third Claim For Relief against Tree of Life Rx, Aronov, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $49,400.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

D.    On the Fourth Claim For Relief against Aronov and the John Doe Defendants for compensatory damages in an amount to be determined at trial but approximately $49,400.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c)

plus interest;

E.    On the Fifth Claim For Relief against Aronov and the John Doe Defendants for compensatory damages in an amount to be determined at trial but approximately $49,400.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

F.    On the Sixth Claim For Relief against NP Houslin and John Doe Defendants Nos. "1" through "10", compensatory damages in favor of GEICO in an amount to be determined at trial but in the approximate amount of $127,800.00, with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.    On the Seventh Claim For Relief against Fine Care Pharmacy, Ballas, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $127,800.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

H.    On the Eighth Claim For Relief against Fine Care Pharmacy, Ballas, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $127,800.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.    On the Ninth Claim For Relief against Ballas and the John Doe Defendants for compensatory damages in an amount to be determined at trial but in excess of $127,800.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

J.    On the Tenth Claim For Relief against Ballas and the John Doe Defendants for compensatory damages in an amount to be determined at trial but approximately $127,800.00,

together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

  K. On the Eleventh Claim For Relief against NP Houslin and the John Doe Defendants for compensatory damages in an amount to be determined at trial but in excess of $127,800.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

  L. On the Twelfth Claim For Relief against Ballas, Aronov, and John Doe Defendants Nos. "1" through "10", compensatory damages in favor of GEICO in an amount to be determined at trial but in the approximate amount of $177,000.00, with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

  M. On the Thirteenth Claim For Relief against Ballas, Aronov, and the John Doe Defendants for compensatory damages in an amount to be determined at trial but approximately $177,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest.

Dated: Uniondale, New York
   April 17, 2025

        RIVKIN RADLER LLP

        By: */s/ Michael A. Sirignano*
          Michael A. Sirignano, Esq.
          Barry I. Levy, Esq.
          Joanna B. Rosenblatt, Esq.
        926 RXR Plaza
        Uniondale, New York 11556
        (516) 357-3000
        *Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*